### Richmond.

Martin and Others v  South Salem Land Co. and Others.

December 3, 1896.

Absent, *Keith*, P., and *Harrison*, J.*

1. Recovery of Stock Subscription—*Act of December 19, 1895, Not Applicable to Suits by Creditors—Nor Where Final Decrees have been Rendered—Contracts—Power of Legislature Over Final Judgments.*—The Act of Assembly approved December 19, 1895, entitled "An Act to prescribe the mode by which unpaid subscriptions to joint stock companies may be recovered by said companies, their receivers, or assignee," has no application to a suit by *creditors* of such companies to recover stock subscriptions, because they are not embraced in the title of the Act. Nor does it apply to a suit in which there has been, before the approval of the Act, a decree entered fixing the rights of the parties, requiring stockholders to pay further sums on their subscriptions, 'and giving executions therefor, although further proceedings in the case were necessary in order to complete the relief for which the suit was instituted. Such a decree is a final decree on the merits within the meaning of the Act, and the case is exempt from the operation of the Act by its very terms. But if not so exempt, the decree appealed from constituted a contract which the Legislature had no power to impair. The Legislature cannot grant new trials, nor direct rehearings, in cases which have been once judicially settled.

2. Construction of Statutes—*Two Constructions Possible, One Valid and the Other Not.*—Where two constructions may be given to a statute, one of which is within the legislative power and the other not, the former will be adopted.

3. Supersedeas—*Effect of.*—A supersedeas to a decree for the payment of money does not vacate, or annul conditionally, the decree, but only stays further proceedings thereon, and leaves matters in the condition in which they were when the supersedeas took effect, until the appellate court can hear the case and pass upon the questions involved in the appeal.

---

*Judge Keith was a party to the suit, and Judge Harrison was detained at home by sickness when the case was argued and submitted.

4. CHANCERY JURISDICTION—*Suit by Judgment Creditor of a Corporation to Sub-ject Unpaid Stock Subscriptions.*—Where a creditor of a corporation has ob-tained judgment against it, upon which execution has been issued and returned no property found, he has the right to sue in equity for the ben-efit of himself and all other creditors who will join in the suit to subject the assets of the corporation, including the unpaid subscriptions of its stockholders, as far as may be necessary, to the payment of its debts. It is in the nature of a creditor's bill, and by it the equitable assets of the corporation can be reached.

5. CHANCERY PLEADING—*Parties—Allegation as to Stockholders—Demurrer.*—An allegation in a bill against the stockholders of a joint stock company that certain persons mentioned in the bill "constitute, as the plaintiffs are informed, the stockholders of said defendant company" must, on de-murrer, be taken as true, and is a sufficient allegation that the persons named constituted the stockholders of the company.

6. CHANCERY PLEADING—*Parties to Bill to Wind Up a Corporation—Parties to Bill by Creditor to Subject Unpaid Stock Subscriptions.*—All the stockhold-ers are necessary parties to a bill filed for the purpose of winding up the affairs of a corporation. But where the object of the bill is to subject corpo-rate assets, including unpaid subscriptions to stock, to the payment of corporate debts, they are not indispensably necessary, though it would be more convenient to have before the court all who have not paid in full, except such as are unknown, insolvent, or beyond the jurisdiction of the court. It is not the duty of creditors to marshal the assets, or adjust the equities between the stockholders. If the stockholders who are parties desire it, they can have the others brought in by proper pro-ceedings for that purpose.

7. COMMISSIONER'S REPORT—*Notice by Publication—Names of Parties—Style of suit—Order of Publication to Commence a Suit.*—Where a commissioner in chancery has been required to give notice by publication in a newspaper to the parties to a suit of the time and place of taking accounts, the no-tice will be sufficient if it gives the style of the suit, and contains all that is necessary to inform the parties of the time and place of taking the ac-count, although the names of the parties are not inserted in it. The ob-ject of giving the notice by publication is to avoid the expense and delay of personal service where the parties are numerous. Having been once served with process they are presumed to know the style of the suit to which they are parties, and the proceedings had therein. These reasons, however, do not apply to an order of publication to commence a suit against parties not previously served with process, and their names must be stated in the publication.

8. CHARTERS—*Circuit Court Charters—Legislative—When Corporation Comes Into Existence.*—When a charter has been granted by a Circuit Court pur-

suant to section 1145 of the Code and lodged with the Secretary of the Commonwealth, the corporation so chartered has a legal existence, so far, at least, that neither it nor its stockholders will be permitted to question it in a controversy with its creditors. But in a charter granted by the legislature, unless otherwise provided in the charter, it is necessary that the minimum capital shall be subscribed as provided by law, and that there shall be a meeting of the stockholders before there is any corporate existence.

9. CHANCERY PRACTICE—*Exception to Deposition—Attention of Trial Court—Waiver.*—If a party wishes to rely upon an exception to a deposition he should bring it to the attention of the trial court, so that it may be acted on, and unless the record shows that this has been done it will be treated in the appellate court as having been waived.

10. STOCK SUBSCRIPTION—*Guaranty not to call but 30 Per Cent. Invalid as to Creditors Without Notice.*—The guaranty of a land company that those who subscribe to its stock shall not be called upon to pay more than thirty *per cent.* of the stock subscribed for, may be valid as between the company and its stockholders, but as between the company and its creditors it is not binding, unless the latter had notice of the guaranty when their debts were contracted. Such guaranty is in fraud of the rights of the creditors, and cannot be enforced to their prejudice. The full amount of the subscription must be paid in money, or money's worth, if necessary to satisfy the demands of creditors, who have no notice of a different contract between the company and its stockholders at the time when their debts are contracted.

11. STOCK SUBSCRIPTIONS—*Fraud or False Representations—Rescission—Innocent Third Parties.*—Fraud or false representations in the procurement of a contract of subscription to stock are grounds for rescission of the contract in the same manner as if the question had arisen between two natural persons, provided the question arises between the contracting parties, and the rights of third persons are not involved. But a contract procured by fraud is not void, but voidable only at the option of the party defrauded. It is binding upon him until rescinded, and if, before he exercises the option to rescind, innocent third parties have, in reliance on the fraudulent contract, acquired rights which would be prejudiced by its rescission, they may generally have it enforced for their benefit, although the party by whose fraud it was procured could not do so.

12. JOINT STOCK COMPANIES—*Payment of Capital Stock—Rights of Creditors—Fraud or False Representations—Rescission—Diligence.*—The capital stock of a joint stock company is the basis of its credit, and every one who deals with it has the right to assume that the stock has been paid in full in money, or its equivalent. As against creditors of the company, its stockholders cannot have their subscriptions rescinded on the ground of

fraud and misrepresentations in the procurement thereof, unless proceed-
ings for that purpose are commenced not only as soon as the fraud or
misrepresentation is discovered, but as soon as the same, by the exercise
of due diligence, might have been discovered.   The stockholder must be
diligent in discovering the fraud, and prompt in repudiating his contract
after it is discovered. . The books and papers of the company are open
to the inspection of its stockholders, and if these disclose the fraud or
misrepresentation complained of, proceedings to rescind the contract of
subscription for such fraud or misrepresention must be commenced as
soon as the stockholder has had a reasonable opportunity of ascertaining
what the books and papers would disclose.   He cannot wait until after
the insolvency of the company to elect to rescind.   In the case at bar
the suit to rescind the contract was not brought until after the insolvency
of the company, and the lapse of more than two years after the subscrip-
tions were made, and is therefore too late.

13. JOINT STOCK COMPANIES—*Insolvency—What Stock Subscriptions Estimated
as assets.*—In determining the solvency or insolvency of a joint stock com-
pany, only such unpaid stock subscriptions as the company has the right
to collect can be estimated, and not those which it has no right to col-
lect, but which its creditors may, under certain circumstances, subject to
the payment of their debts.

14. CORPORATIONS—*Notice—Dealings Between Two Companies Having a Common
Director.*—A corporation is not affected by the knowledge of an agent,
when the agent himself contracts with it, or otherwise deals with it in a
transaction in which his interest and the interests of the company are
opposed, for in such a transaction he could not represent the company.
Where two companies, having the same person as director, enter into
dealings with each other, the knowledge of the common director can-
not be imputed to either company in a transaction in which he did
not represent it.

Argue1 at Wythoville.   Decided at Richmond.

Appeal from two decrees of the Circuit Court of Roanoke
county, pronounced January 8, 1894, and September 27,
1894, in the chancery suits hereinafter mentioned.

*Affirmed.*

The decrees appealed from were pronounced in six chan-
cery suits heard together.   Three of these were in the names
of Thomas S. Martin, J. L. Moon, and Pitts & Dorrier, re-
spectively, against the South Salem Land Company and

others, defendants.  These suits were brought to the September Rules, 1892, for the purpose of procuring a rescission of the contracts of subscription of the respective complainants to the stock of the South Salem Land Company, and to have refunded to them respectively what had been paid by them under their contracts.  The fourth suit was in the name of the South Salem Land Company against L. C. Hansbrough, Trustee, and others, to enjoin a sale which had been advertised by the trustee, of a tract of land owned by the complainant, and upon which the complainant had executed a deed of trust, which the trustee was proceeding to enforce; the chief ground for the injunction being that the title to the land was clouded by reason of certain judgments on the lien docket against a prior owner, which had not been marked satisfied, and that the trustee did not have the legal title to the land, and could not convey title to the purchaser, and that the trustee was requiring different terms of sale from those designated in the deed under which he was acting.  The injunction awarded in this case was subsequently dissolved, and a decree entered for the sale of the property.  The fifth case is that of Gates & Brown against L. C. Hansbrough, Trustee, and others, the object of which was to enjoin the sale of the same tract of land, on the ground that other suits were pending to ascertain the rights and liabilities of the different stockholders of the company, and that no sale should be made until these questions had been first adjudicated by the court. The sixth suit was that of the Bank of Salem and the Pittsburg Bridge Company, suing on behalf of themselves and all other creditors of the South Salem Land Company who might come in and contribute to the expenses of the suit, against the South Salem Land Company, sundry persons who were interested in a tract of land owned by that company, and against all the stockholders of the company.  The complainants had each recovered judgment against the company, and the suit was brought to enforce collection from the stock-

holders of enough money to pay the debts of the company. Nearly three hundred stockholders were made defendants. An order of reference was made in this case to ascertain, among other things, the debts outstanding against the company, who were the stockholders, and how much each of said stockholders owed the company. Notice of this account was published, as authorized by the decree, giving the style of the suit, the time and place at which the account was to be taken, and a statement as to what accounts were ordered, and requiring the parties to the suit, without naming them, to take notice of the time and place fixed in the notice for taking said accounts. After the publication of the notice, the account was taken and returned to court, and various exceptions were filed thereto, amongst others, on the ground of the insufficiency of the notice, especially because it does not give the names of all the parties.

A demurrer was filed to the bill last mentioned, and was overruled by the court. One ground of the demurrer was that the contracts of subscription on the part of the subscribers were common law contracts, which could only be enforced by common law actions, and that the subscribers were guaranteed by the Constitution the right of trial by jury. The defendants insisted that the proceeding by a bill in chancery deprived them of this right, and hence any decree that could be entered in the case would be erroneous, or, at best, that a court of chancery could not do more than to ascertain what amount should be assessed upon the stockholders, and appoint a receiver to collect it, and that the receiver should then be required to proceed by action at law against the several stockholders on their contracts of subscription. Numerous petitions were filed in this suit, and sundry injunction orders awarded to stay the collection of decrees against some of the parties for their stock subscriptions. These injunctions were subsequently dissolved, and decrees rendered against the parties for the amounts ascertained by the court to be their

*pro rata* assessment, in order to raise a fund to pay the debts established in the case.    Many of the stockholders answered the bill, and in most instances prayed that their answers might be treated as cross-bills, the defendants relying upon the allegation that their subscriptions had been obtained by fraud and false representations, and that they had repudiated their contracts of subscription as soon as they learned of the fraud, and asking to have them rescinded.

The other facts sufficiently appear in the opinion of the court.

*Griffin & Glasgow, M. M. Gilliam, Maury & Maury, Harrison & Long, Watts, Robertson & Robertson, C. M. White, M. G. McClung, Frank P. Christian, Scott & Staples,* and *Staples & Munford,* for the appellants.

*Phlegar & Johnson, L. C. Hansbrough,* and *A. B. Pugh,* for the appellees.

BUCHANAN, J., delivered the opinion of the court.

Upon the calling of this appeal the appellants made a motion to remand the cause of the Bank of Salem, &c., against South Salem Land Co., &c. (one of the six causes heard together in which the decrees appealed from were entered), to the trial court with direction to dismiss it.    They base their right to have that suit dismissed upon the provisions of an Act of the General Assembly approved December 19, 1895, entitled

"An Act to prescribe the mode by which unpaid subscriptions to joint-stock companies may be recovered by said companies, their receivers, or assignee."

This Act provides:

" 1. That all suits or motions for the recovery of unpaid stock subscriptions to the stock of any joint-stock company, shall be brought in the courts of common law of this Commonwealth, in the county or corporation where the

Opinion.

defendant resides, and said courts shall have exclusive jurisdiction to hear and determine all questions involving the validity of such subscriptions.

"2. In all such cases the defendant shall be entitled to a jury, where the amount involved exceeds twenty dollars. All pleas, defences, and evidence which would be admissible if the company were solvent, shall be equally admissible, and shall have the same effect in law in any action brought after the insolvency of any such company ; and this Act shall apply to all suits heretofore or hereafter brought where no final judgment or decree on the merits has been rendered." Acts of Assembly, 1895-6, pp. 25 and 26.

The suit which the appellants wish to have dismissed is not, in our opinion, within the provisions of that Act. It expressly excepts from its operation all suits brought before its enactment in which a final judgment or decree upon the merits of the case had been rendered. This was a creditor's suit brought for the purpose of subjecting the assets of the South Salem Land Company, including the unpaid subscriptions of its stockholders, to the payment of its debts. It was brought in the year 1892, and was regularly proceeded in. After subjecting the assets of the land company, other than the unpaid subscriptions of its stockholders, and applying the proceeds to the payment of its debts according to their priorities, there remained a large part of its indebtedness unsatisfied. To meet this the court entered a decree against the stockholders who had not paid the whole of the thirty *per cent.* of their stock subscriptions theretofore called for by the land company, for the balance due from them, and against all the stockholders before the court for an additional twenty *per cent.* of their subscriptions, with authority to the receiver of the court to have execution against each for the amount so decreed, with costs.

We do not think that the legislature by that Act intended to deprive a court of equity of jurisdiction over a suit in which a decree had been entered, fixing the rights of the parties, requiring the stockholders to pay further sums on their stock subscriptions, and giving executions therefor, although further proceedings were necessary in the case in order to

complete the relief for which the suit was brought. It was clearly a decree upon the merits of the case, and what remained to be done was merely to execute and give effect to that decree.

Before the Act was passed one of the judges of this court had granted an appeal from, and awarded a supersedeas to the decree. The effect of the supersedeas was not, as appellants contend, to vacate or annul conditionally the decree. Its only effect was to stay further proceedings upon the decree, and leave matters in the condition in which they were when it took effect, until this court could hear the case and pass upon the questions involved in the appeal. *Bristow* v. *Home Building Association,* 91 Va. 18.

But if the Act were susceptible of the construction for which the appellants contend, viz., that it applies to all cases in which there has not been a final decree in the broadest sense of that term, so that nothing further remained to be done in the case, then the legislature had no right to pass such an act.

The legislature within certain limitations may alter and control remedies by which litigants assert their rights in the courts, but when the litigation has proceeded to judgment or decree upon the merits of the controversy, it has passed beyond its power.

It has been uniformly held that the legislature has no power to grant a new trial or to direct a rehearing in a cause which has once been judicially settled, and that every such attempt is plainly an invasion of judicial power, and is therefore unconstitutional and void.

Immediately upon the rendition of a judgment or decree for money, there arises a contract against the party adjudged to pay in favor of him for whose benefit it is awarded, which the legislature has no power to impair. "Where," says Blackstone, "any specific sum is adjudged to be due from the defendant to the plaintiff in an action or suit at law, this is a

contract of the highest nature, being established by the sentence of a court of jurisdiction." 1 Chitty's Blackstone, book 2, marg. page 455; *Ratcliffe* v. *Anderson*, 31 Gratt. 105; *Griffin's Ex.* v. *Cunningham*, 20 Gratt. 31. But where two constructions, however, may be given a statute, one of which is clearly within the legislative power and the other beyond it, the Legislature will be held to have intended to do what it had the right to do, and not that which was beyond its power.

But even if the Legislature had the right to enact the statute in question as contended by the appellants, the title to the act did not authorize any legislation as to the mode by which *creditors* might recover such unpaid stock subscription. The title restricts the legislation under it "to the mode by which unpaid subscriptions to joint stock companies may be *recovered by said companies, their receivers or assignee.*" Any legislation, therefore, which is contained in the Act as to the mode by which such stock subscriptions might be recovered in a creditor's suit is void. The Constitution has made the title of an Act the conclusive index of the intention of the legislature as to what shall have operation, and if the title is so framed as to include only certain matters, other legislation beyond the matters is inoperative, although it might with entire propriety have been embraced in the same statute with the matters indicated by the title, if the title had been more comprehensive. Cooley's Const. Lim. (6th ed.), pp. 177 to 179.

If the court in which the creditor's suit was brought, instead of entering a decree in that suit directly against the stockholders for their unpaid stock subscriptions, as was done in this case, should direct its receiver to institute independent proceedings against them for the recovery of such subscriptions, then he would be clearly within the scope of the Act, and must conform to its provisions.

The motion to remand must be overruled.

The court overruled the demurrer to the stockholders of the land company to the creditor's bill, and this is assigned as error.

1. Because the contracts of the stockholders of the company for its stock were common law contracts which could only be enforced by common law actions, where they would have the right of trial by jury.

Where a creditor of a corporation has obtained judgment against it, upon which execution has been issued and returned no property found, he has the right to sue in equity for the benefit of himself and all other creditors who will join in the suit to subject the assets of the corporation, including the unpaid subscriptions of its stockholders as far as may be necessary to the payment of its debts. It is in the nature of a creditor's bill, and by it the equitable assets of the corporation can be reached. It is said by some of the authorities on the subject to be the most effectual, simple, and just remedy, and is not only the favorite remedy of the courts, but is generally resorted to by the creditors themselves. 2 Morawetz on Pr. Corp., sec. 866; 1 Cook on Stockholders, &c., sec. 204; 5 Thompson on Corp, sec. 6559.

2. Because all the stockholders were not made parties to the suit.

It does not appear from the bill that all the stockholders were not made parties to the suit. On the contrary, the bill alleges that "the following named persons constitute, as plaintiffs are informed, the stockholders of the said defendant company;" and after giving the names and amounts subscribed and paid by each, asks that they be made parties defendant to the suit, &c. Upon demurrer, this allegation must be taken as true, and was a sufficient allegation that the parties named constituted the stockholders of the land company.

Where a bill is filed for the purpose of winding up the affairs of a corporation, all the stockholders are necessary parties. *Cason* v. *Seldner*, 77 Va. 293. But while it would

be more convenient to make all the stockholders who have
not paid their stock subscriptions in full, parties, except such
as are unknown, insolvent, or beyond the jurisdiction of the
court, where the object of the bill is to subject corporate as-
sets, including unpaid stock subscriptions, to the payment of
corporate debts, they are not indispensably necessary parties.
It is not the duty of creditors to marshal the assets, or to ad-
just the equities between the stockholders.     In that, the cre-
ditors have no interest.     If the stockholders who are made
parties desire the other stockholders brought before the court,
they can by proper pleadings have it done.     *Ogilvie* v. *In-
surance Company*, 22 How. 380; *Hatch* v. *Dana*, 101 U.
S. 205; 1 Morawetz on Corporations, sec. 315; 2 Id. sec.
8661; Cook on Stockholders, &c., sec. 207 and note 1;
Thompson on Corp., sec. 3494.

One of the exceptions to the report of the commissioner
who took the account in the case was that "It was taken
and stated without legal notice to the exceptors."     This ex-
ception was overruled by the Circuit Court, and its action in
so doing is assigned as error.     The commissioner was directed
to give notice of the time and place of taking the account by
publication once a week for four successive weeks in some
newspaper published in the town of Salem, which publication
it was provided by the decree should be in lieu of personal
service of notice on the parties.     The objection made to the
notice that was given by publication, is that it did not set
out the names of the parties to the suit.     It gave the style of
the suit in which the account was ordered, contained extracts
from the decree directing it, which showed what the commis-
sioner was to ascertain and report, and gave the time when
and place where the account would be taken.     The parties to
this suit numbered near three hundred.     Those who excepted
to the report on this ground were properly before the court,
and represented by counsel.     They are presumed to have
known of the decree directing the account, as well as of all

other proceedings in court which were had in the cause.
They knew the style of the suit, the purposes for which the
account was ordered, and that notice of the time and place
of taking it would be given by publication in a newspaper,
and not by personal service.

The object of giving notice by publication is to avoid the
expense and delay of giving personal notice where there are
a great number of parties.

If such notice gives the style of the suit, and contains all
that is necessary to inform the parties of the time and place
of taking the account, although the names of the parties are
not inserted in it, it will be sufficient.

An order of publication made for the purpose of giving no-
tice to parties that they have been sued, and to bring them
before the court, stands upon a very different footing from
an order of publication to give notice of the time and place
of taking an account ordered by the court in a pending cause.
Unless the parties are named in the publication giving notice
of the suit brought, they do not know that they have been
made parties to the suit at all.     But where they have been
properly brought before the court in the first instance, they
are presumed to know the style of the cause to which they
are parties, the proceedings had therein, and there is no such
necessity for inserting their names in the notice.

Under the facts of this case the exception was properly
overruled.

The assignment of error that the bill of the Bank of Salem,
&c., should have been dismissed, either on demurrer or on
the hearing, because it was neither alleged nor proved that
the land company had been legally created, must be over-
ruled, even if it was necessary for the complainants to allege
and prove that fact.     The bill distinctly alleges that the
"South Salem Land Company is a corporation chartered
under the laws of the State of Virginia, and was duly organ-
ized for business about the month of March, 1890."     The

land company was incorporated by the Circuit Court of Roanoke county, pursuant to section 1145 of the Code, and a copy of its charter lodged with the Secretary of the Commonwealth, and recorded in his office. As soon as the charter was properly lodged in his office for recordation, it is provided by section 1146 of the Code that the persons who signed and acknowledged the certificate (upon which the charter was granted) and their successors, and such other persons as may be associated with them according to the provisions of their charter, shall be a body politic and corporate by the name set forth in the certificate, &c., with all the general powers and subject to all the general restrictions provided by law previously or subsequently made. 1 Minor's Inst. (4th ed.) 558, 582.

In a legislative charter, unless there is some provision in the charter to the contrary, the general law directs that commissioners named in the Act to receive subscriptions shall give thirty days' notice of the times and places for opening the books of subscription, and shall keep them open for ten days, and longer if need be. When it appears to the commissioners at the place first named in the Act that so much of the capital stock has been subscribed as is sufficient to incorporate the subscribers, they are required to give notice by publication, and call a meeting of the subscribers. From the time of such meeting, the subscribers and their personal representatives and assigns, stand incorporated, unless the meeting of the subscribers determine otherwise. Code, sections 1106 to 1111; 1 Minor's Inst. (4th ed.) 582-3.

In one case the subscription of the minimum amount of stock required, and a meeting of the stockholders, are made conditions precedent to its corporate existence, whilst in the other it stands incorporated from the time the charter is lodged with the Secretary of the Commonwealth.

When a charter has been granted by a Circuit Court pursuant to section 1145 of the Code, and lodged with the Sec-

retary of the Commonwealth for recordation (the tax thereon having been paid, when a tax is imposed), the corporation so chartered has a legal existence, so far at least that neither it nor its stockholders will be permitted to question it in a controversy with its creditors. To hold otherwise would be to disregard the express language of section 1146 of the Code.

It is further insisted that, even if the land company did have a legal existence, the appellants cannot be compelled to pay for the stock subscribed for by them, because, by the prospectus of the land company and their contracts with it to take stock, their subscriptions were made upon the condition that a certain amount of stock should be subscribed for, and that this had not been done.

If this assignment of error were good in point of law, it is not true in fact. The record shows that at least the minimum amount of stock of the company was subscribed for, and that the conditions upon which the appellants allege that their subscriptions were made were performed. Upon this point the creditors took the deposition of Kime (among others), the commissioner who took the account in the case. It was excepted to by some of the parties for want of notice, and that exception is insisted on here. Neither that exception nor any other exception or objection to evidence was brought to the attention of the Circuit Court when the case was heard. It cannot, therefore, be considered here. A party who excepts to a deposition, if he wishes to rely upon the exception, must bring it to the attention of the court below, so that it may be acted upon by it, and, unless the record shows that this has been done, the exception will be treated in the appellate court as having been waived. *Fant* v. *Miller & Mayhew*, 17 Gratt. 187; *Simmons* v. *Simmons*, 33 Gratt. 451, 460-1.

The guarantee of the land company that those who subscribed for its stock would not be called upon to pay more than thirty *per cent.* of the stock subscribed for may be valid

as between the land company and its stockholders, but, as between the company and its creditors, it is not binding, unless the latter had notice of the guarantee when their debts were contracted. The capital stock of a corporation is the fund or resource upon which it is enabled to do business, and upon the faith of which persons give it credit and become corporate creditors. Third parties, in dealing with it, have the right to assume that its actual capital in money, or money's worth, is equal to the capital stock which it claims to have, except so far as it has been lessened or impaired by losses in business. They have the right also to assume that its capital stock has been or will be fully paid, if necessary to meet its liabilities. 1 Cook on Stockhoders, secs. 199, 200; 2 Morawetz on Corp., sec. 781; 2 Thomp. on Corp., sec. 1561.

By the act of incorporation a privilege is conferred which exempt individual members from all liability except that the stock which they hold must be paid for, and good faith to the public requires that they shall be held to a strict compliance with all the obligations imposed by that membership.

By statute with us the assignee of the stock, as well as the assignor, is each made liable for any unpaid instalment already accrued, or that may thereafter accrue upon the subscription. As Mr. Minor well says: "The obligation of a subscriber, therefore, to pay his subscriptions can neither be relieved nor qualified to the prejudice of the creditors of the company." 1 Minor's Inst. (4th ed.), 585.

Morawetz, in his work on Corporations, says, in discussing this subject: "The law is accordingly settled that any condition or arrangement attached to the contract of a shareholder in a corporation, which, if carried out, would lessen the amount of capital held out to creditors as their security, is a fraud upon creditors and will therefore be denied effect." Sec. 842.

Thompson says: "Shareholders who purchase their shares

*from the company* at less than their par value, will, in the event of its insolvency, be liable to make good to its creditors the difference between its par value and the price at which it was issued to them.    They must then pay, for the benefit of the creditors, any balance on account of shares subscribed for or purchased by them which has not been paid up in good faith in money's worth.''    2 Thomp. on Corp., sec. 566.    See also, 11 Cook on Stocks and Stockholders, sec. 42, and cases cited in notes.

In the case of *Hundley* v. *Stutz*, 139 U. S., 417, the Supreme Court of the United States, whilst holding that an active corporation might, for the purpose of paying its debts in order to successfully prosecute its business, issue new stock and sell it for the best price that could be obtained, also held that it was the settled doctrine of that court that a contract between subscribers to the stock of the corporation that the stock shall be treated as fully paid and non-assessable, or *otherwise limiting their liability*, is void as against creditors. Mr. Justice Brown, in delivering the opinion of the court, said, upon this question: "While an agreement that the subscribers or holders of stock shall never be called upon to pay for the same may be good as against the corporation itself, it has been uniformly held by this court not to be binding upon its creditors."    See, also, the case of *Clark* v. *Bever*, 139 U. S. p. 96, &c., where many of the decisions of that court upon the subject are cited and commented upon.

It is also contended that thirty *per cent.* of the stock was more than its actual value, and that, having paid the full value of the stock, they cannot be required to pay anything more for it.    To sustain this view they cite cases where subscribers to stock paid for it in property worth less than the par value of the stock subscribed for, and also cases where creditors received payment of their debts in stock at less than its face value.    In the first class of cases the payment for the stock in property at more than its real value was sustained,

because there was no evidence that there was a fraudulent over-valuation of the property. In the other class of cases the incorporations were unable to meet their indebtedness, and the creditors, to save themselves from loss, accepted the stock in payment of their debts at supposed actual value.

Even if the doctrines laid down in those cases be not inconsistent with the well-established general rule that, unless the governing statute otherwise provides, shares of corporate stock can only be issued by the *corporation in the first instance at their par value*, they can have no application to this case. These appellants did not undertake to pay for their stock in property. There is no pretense that they have paid more than thirty *per cent.* of the par value of the stock in money, or money's worth. Neither were they creditors of the company, who, to save their debts, took stock in payment at its actual value. They subscribed for the stock and must pay for it, so far as may be necessary to satisfy the creditors of the company who did not have notice of the thirty *per cent.* guarantee when their debts were contracted, unless they are entitled to relief on some other ground.

Another ground upon which the appellants claim that they are not liable for their subscription contracts is that they were induced to become subscribers by the false and fraudulent representations of the company, or its agents. One of the false and fraudulent representations which it is alleged was made to certain of the appellants was that there was no promoter's fund except $10,000 of the paid up stock of the company, when, in fact, two of the promoters of the scheme, Crabtree and Bowman, were to receive the sum of $20,000 additional, in money, and that they did receive the greater part thereof. To others it was represented that among the subscribers to the stock of the company were two well-known business men of much experience and large wealth, when, in fact, one of them had made no subscription at all, and the other had subscribed for a much less sum than was repre-

sented.   And to others still, both these representations were made.

If it be assumed that these representations were made and relied on; that they were not true, and were sufficient to entitle the appellants to have their contracts rescinded and the money paid by them refunded, as between themselves and the land company, did they show themselves entitled to such relief as against the creditors of the land company whose debts were decreed to be paid by the court below?

It appears that a meeting of the stockholders had been called for the 17th of May, 1892, to consider the affairs of the company.   A majority of the stock not being represented on that day, a committee was appointed to prepare a statement in regard to its affairs, and the secretary was instructed to send a copy of that statement to each stockholder, and urge him to be present at an adjourned meeting of the company to be held on the 9th of June, following.   Pursuant to that resolution, the following statement was prepared and sent to the stockholders:

"A CIRCULAR OF INFORMATION FOR STOCKHOLDERS OF THE SOUTH
SALEM LAND COMPANY.

"The following is a copy of the prospectus under which the stock to the South Salem Land Company was subscribed:

" 'The South Salem Land Company, of Salem, Virginia, owns 306 acres of land, lying on the east side of the Salem Development Company, south of the Salem Improvement Company, and southwest of the Riverside Land Company, and is known as the Colonel Jack farm.

" 'This land cost the company $81,200 in cash, and $10,000 in paid-up stock. The capital stock of the company is $300,000, divided into shares of $10 each, only $250,000 of which shall be issued unless necessary for the special betterment of the land in the future, and $10,000 of which is the paid-up stock referred to above.   It is proposed to sell $240,000 of the stock on the following terms : Ten *per cent.* payable on March 20th, and ten *per cent.* on April 20th, 1890, and ten *per cent.*, payable on March 20th, 1891.   It is guaranteed that only the above named assessments will be made.

" 'We, the undersigned, subscribe to the amounts opposite our names upon the above named conditions.'

"Under the above prospectus subscription lists were sent in by the several agents for the whole amount of the $240,000 stock, but only on 19,541 shares have the three assessments been nearly all paid. On the remaining 5,088 shares on the list nothing has been paid, and the stock advertised and offered for sale was withdrawn for want of bidders. While every effort will be made to collect, it is found that a large *per cent.* of the lists is insolvent. If we had $3 per share on those shares this amount of $15,440 would be sufficient for our necessities, and enable us to carry on the affairs of the company successfully.

"We now absolutely need about $12,000 for present pressing dues. If this amount cannot be raised now, a forced trustee's sale of the property will be the inevitable result.

"The stockholders cannot be further assessed by the company, unless the stockholders themselves vote to make the assessment.

"A single ten *per cent.* assessment would relieve the condition of things now and secure the stockholders further advantages.

"Be sure to come or send your proxy to the meeting.

"*Salem, Virginia, June 1st, 1892.*"

The indebtedness of the land company at that time was more than $40,000. Its assets, independent of its stock subscriptions, consisted of the tract of land mentioned in the prospectus, which it seems had never been assessed for the purposes of taxation at more than $18,000, and which, when sold in December, 1893, only brought $10,000, and upon a resale in February, 1894, $9,000. Upon its stock subscriptions, on which no part of the thirty *per cent.* called for had been paid, there was a little over $15,000 due, but the larger part of it was due from insolvent parties. There was also a small balance due from stockholders belonging to the class who had made payments on their stock subscriptions. The land company was not only unable to meet its debts as they became due, but its assets were altogether insufficient to pay its liabilities. Unless the stockholders were willing to make additional payments upon their stock, which the company admitted it had no right to call for under its guarantee to them, the land of the company, which was its principal asset,

and the development and sale of which was the chief object of its creation, would be sold at a trustee's sale for the residue of the purchase price.

No provision having been made by the company or its stockholders to meet the indebtedness, the trustee gave notice that he would, on the 18th day of August, 1892, sell the land. On the 10th of that month the sale was enjoined by an order entered in the case of the *South Salem Land Co.* v. *Hansbrough, Trustee, &c.* The bill in that case did not claim that the debt for which the land was advertised to be sold was not just, due, or unpaid, but alleged that there were clouds upon its title which ought to be removed before sale, and that the notice of sale was not in conformity with the provisions of the deed of trust.

At the October term following of the Circuit Court, two judgments were rendered against the land company, one in favor of the Bank of Salem, and the other in favor of the Pittsburg Bridge Company, for sums aggregating more than $11,000. Upon these judgments executions were issued and returned "no property found."

In December of the same year the Bank of Salem and the Bridge Company instituted suit against the land company and its stockholders for the purpose of subjecting its assets, including the unpaid subscriptions of its stockholders, to the payment of their debts, and the debts of the other creditors of the company who would come in and contribute to the expenses of the suit.

In that case the appellants (except in three cases which will be hereafter considered) for the first time took steps to have their subscription contracts rescinded.

A party who has been induced to subscribe for stock in a corporation by false or fraudulent representations as to a material fact upon which he had the right to rely, and did rely, is entitled to have the contract rescinded in the same manner as if the question had arisen between two natural per-

sons, provided the question arises between *the contracting parties* and the rights of third persons are not involved. 1 Morawetz on Corp., sec. 108; 2 Thompson on Corp., sec. 1361; 1 Cook on Stocks & Stockholders, &c., secs. 151-161.

A contract procured by fraud is not void, but voidable only, at the option of the party defrauded. It is binding upon him until rescinded, and, if before he exercises the option to rescind, innocent third parties have, in reliance on the fraudulent contract, acquired rights which would be prejudiced by its rescission they may generally have it enforced for their benefit, although the party by whose fraud it was procured could not do so. *Oakes* v. *Turquand, &c.* (House of Lords), 2 Eng. & Irish Appeal Cases, L. R. 325; *Tennent* v. *City of Glasgow* (House of Lords), 4 Appeal Cases, L. R. 615; 2 Thompson on Corp., sec. 1363; 2 Morawetz on Corp., sec. 839.

This principle is founded in reason and justice. If one of two innocent persons must suffer from the misconduct of a third, the burden must fall upon the one whose conduct enabled the third person to perpetrate the wrong complained of.

If a person is induced by fraud to sell his property, and it passes into the hands of an innocent purchaser for value before his contract by which he sold has been rescinded, he must bear the loss rather than the innocent purchaser.

In an ordinary partnership it is impossible for one partner to retire from or repudiate the partnership to the prejudice of the partnership creditors. He may have been induced to enter into the partnership by the false or fraudulent representations of the other partners, and this may be a sufficient ground for relief against them, but it is no ground for getting rid of the firm's liabilities to its creditors.

The shareholders in a corporation are the real parties in interest. They furnish the capital and receive the profits. As was said by Mr. Justice Miller in *Sawyer* v. *Hoag,* 17

Wall. 610, the corporation "is but the representative of its stockholders, and exists mainly for their benefit, and is governed and controlled by them through officers whom they elect, and the interest and power of legal control of each shareholder is in exact proportion to his amount of stock."

In the case of *Oakes* v. *Turquand*, &c., cited above, it was held by the House of Lords that, after the winding up of a joint stock company had commenced, a stockholder could not have his contract rescinded for fraud in its procurement. This decision was based upon the ground that innocent third parties acquired rights which would be defeated by the recision. In that case the decision of Lord Campbell, in *Henderson* v. *Royal British Bank* (7 E. & B. 356), was approved. Lord Campbell said in that case: "This is an application by a creditor who, upon the faith of the party who was then a shareholder, and who held himself out to the world as a shareholder, and, being one, gave credit to the bank. He has obtained judgment against the bank. There were no assets of the bank as a company, and the application now is that execution may issue against the party individually. It would be monstrous to say that he having become a partner and a shareholder, and having held himself out to the world as such, and having so remained until the concern stopped payment, could, by repudiating the shares on the ground that he had been defrauded, make himself no longer a shareholder, and thus get rid of his liability to the creditors of the bank, who had given credit to it upon the faith that he was a shareholder. It would be a monstrous injustice and contrary to all principle." *Tennent* v. *City of Glasgow Bank*, 4 Appeal Cases (H. L.) 615; *Stone* v. *City and County Bank*, 3 C. P. Div. 282; *Wright's Case*, L. R., 7 Chy. 60; *Pugh & Sharman's Case*, L. R., 13 Eq. 572; 2 Thomp. on Corp., secs. 1441, 1442; 1 Cook on Stocks and Stockholders, sec. 163.

In this country, in the absence of statutory provisions upon the subject, the rule seems to be, says Morawetz, in his

work on Corporations, "that a shareholder whose contract of subscription was obtained by fraud would be liable to contribute his share of the capital upon the insolvency of the company, so far as this may be required, in order to satisfy those creditors whose claims attached before he elected to disaffirm the contract." Sec. 840.

Thompson says: "It may be concluded from a number of American cases that no rescission will be allowed after the bankruptcy or insolvency of the corporation has supervened unless under very exceptional circumstances, if at all; and further, that the fact that a stockholder was induced to take stock by false representations is no defence in an action by judgment creditors of the corporation on his statutory liability." 2 Thomp. on Corp., sec. 1450.

Cook says upon this subject: "In this country the effect of corporate insolvency upon the right of a subscriber to rescind his contract for fraud has not been passed upon as often as in England. The decisions, however, clearly hold that corporate insolvency is a bar to such rescission." 1 Cook on Stocks & Stockholders, secs. 163, 164.

The decisions of the courts, we think, sustain the doctrine laid down in the text-books that a person who has to all external appearances become a stockholder, cannot, as to creditors who may have trusted the company upon the faith of his membership, have his contract of subscription rescinded upon the ground of fraud where he did not repudiate the contract, and take steps to have it rescinded, before the company stopped payment and became actually insolvent; certainly not, where it does not appear that he was diligent in discovering the fraud and prompt in repudiating his contract after it was discovered. *Upton* v. *Tribilcock*, 91 U. S. 45; *Webster* v. *Upton*, Id. 65; *Sanger* v. *Upton*, Id. 56; *Chubb* v. *Upton*, 95 U. S. 665; *Ogilvie* v. *Knox Ins. Co.*, 22 How. 380; *Tennent* v. *City of Glasgow Bank*, 4 Appeal Cases (H. L.), 615; *Turner* v. *Granger, &c.* (Ga.), 38 Am. Rep. 801; *Howard*

*v. Glenn* (Ga.), 11 S. E. 610; *Saffold* v. *Barnes*, 39 Miss. 399; *Duffield* v. *Barnum*, 59 Mich. 272.

Before the appellants had repudiated their contracts the land company was insolvent. It was insolvent, whether that word be used in its restricted sense, to indicate the inability of an individual to pay his debts as they become due in the ordinary course of business, or in its general or popular meaning, to denote that the entire assets of a debtor are insufficient to pay his debts. *Toof* v. *Martin*, 13 Wall. 40. Not only was this true, but its real estate had been advertised for sale for the purchase money yet due upon it, which was more than it was worth. Judgments had been obtained against the company, as before stated, executions issued and returned "no property found," and a creditor's bill filed to subject its assets to the payment of its debts, in which it was alleged that independent of its unpaid stock subscriptions (which the company admitted it had no right to collect, except so much of the thirty *per cent.* called for as remained unpaid,) the company was insolvent. This was more than two years and a half after their subscriptions had been made. The excuse given for this delay is that they did not discover the fraud complained of earlier. There is nothing in the evidence to show that any diligence was exercised by them to discover whether the alleged false representations made to them were true or not.

It is not sufficient in a case like this, where the rights of creditors are involved, that a stockholder should be prompt in repudiating his contract of subscription and in seeking to have it rescinded after the fraud has been discovered, but he must be diligent also in discovering the fraud. Where a party has the means of knowledge or discovery in his power, he will be deemed to know all that with ordinary care and diligence he might have obtained knowledge of. A delay which might be of no consequence in an ordinary case may be amply sufficient to bar the title to relief where the property is of a speculative

character, or is subject to contingencies, or where the rights and liabilities of third parties have been in the meantime varied. Parties, it is said, who are in the position of shareholders in companies, if they come to the court to be relieved from their shares on the ground of fraud, must come with the utmost diligence and promptitude. Kerr on Fraud & Mistake, 306, &c.; Morawetz on Corp., secs. 108, 839; *Chubb* v. *Upton*, 95 U. S. 665; *Upton* v. *Tribilcock*, 91 U. S. 45; 2 Thomp. on Corp., sec. 1438, &c.

There are some expressions in the opinions of this court in *Bosher* v. *R. & H. Land Co.*, 89 Va. 455; *Va. Land Co.* v. *Haupt*, 90 Va. 535; and *Weisiger* v. *Richmond Ice Co.*, 90 Va. 795, which counsel insist are in conflict with the doctrine just stated. We are not satisfied that the judges delivering those opinions intended to state the rule upon the subject differently from what we have stated it to be. Those were cases between the company and its stockholders, to which the creditors were not parties, and in which their rights were not involved. No expression of opinion upon the subject was therefore necessary, and being mere *obiter* we would feel at liberty, even if it were clear that they bore the construction contended for, to follow that rule upon the subject which, in our opinion, is more in consonance with reason and justice, and which is supported by the weight of authority.

If that diligence had been exercised by appellants which the law imposed upon them in such cases, they could easily have discovered the fraud complained of. The books and papers of the company to which they had the right of access would have disclosed the fact that H. C. Stuart had only subscribed to $10,000 of the stock instead of $100,000, and that Geo. W. Palmer had not subscribed at all.

The deed to the 306-acre tract of land, which was all the land that the company owned, and its chief asset, showed that Crabtree, one of the promoters of the company, had not only

received $10,000 in the paid-up stock of the company, but
had received the additional sum of $17,600 in money. This
deed was recorded in the clerk's office of the County Court
of Roanoke county, in the town of Salem, where the princi-
pal office of the company was, and the original was doubtless
filed among the papers of the company where it belonged.
From these papers, to which they had the right of access,
they could easily have ascertained the facts. But there is no
evidence that they exercised any diligence, or made any
effort whatever, after their subscriptions were made, to ascer-
tain whether the representations upon which they were in-
duced to make them were true or not, until more than two
and one-half years afterwards, and after the company had be-
come insolvent.

What has been said with reference to the condition of the
company and the want of diligence on the part of the appel-
lants who did not take steps to have their contracts rescinded
until after the creditor's bill against the company had been
filed, applies with full force in all material points to the three
stockholders who filed their several bills to have their
subscription contracts rescinded before the creditor's bill
was filed, except as to what took place after their suits
for rescission were brought. Their suits were brought the
2d of September, 1892. They rely upon substantially the
same grounds of false representations for relief as the other
appellants did. They allege that they did not discover the
fraud until about the 17th day of May, 1892, but do not al-
lege that they made any effort, after they became stockhold-
ers, during the more than the two years that intervened be-
tween the time they became subscribers to the stock of the
company and the time they discovered the fraud, to dis-
cover it, or exercised any diligence whatever to ascertain
whether or not the representations relied on were true or
false. Nor do they in the pleadings give any excuse why,
after they discovered the fraud in May, they delayed until

September following before they repudiated their contracts, and brought their suits to have them rescinded. In the evidence they show that upon the 9th of June, after they had ascertained that the said representations were certainly untrue, and after they had, through Mr. H. C. Stuart, Vice-President of the Land Company, tried to induce, without success, Messrs. Crabtree and Bowman to restore the $17,600 received by them to the treasury of the company, they employed counsel to institute suits to cancel their stock subscriptions, and to recover what they had paid to the company therein; that they also notified Mr. Stuart that they would not participate in any meeting of the stockholders whereby any question could arise that they had approved the transaction, and that they did not afterwards acquiesce in, or approve it. But there is no evidence that they notified the company that they repudiated their contracts and demanded rescission until they did so by bringing their suits. In June they had notice of the company's condition; that the only stock subscriptions, which it had the right to collect were largely insolvent; that the company then "absolutely needed about $12,000 for pressing dues," and "if this amount cannot be raised now a forced trustee's sale of the property will be the inevitable result;" and that unless the stockholders would come to the relief of the company its career as a "going concern" was ended. Soon afterwards the stockholders, not having come to its relief, the trustee advertised the property (that is the land, its only available asset of value,) for sale. That sale was enjoined. It was not until after this that these stockholders instituted their suits repudiating their contracts of subscription, and asking for their rescission. At that time the company was clearly insolvent. It was not only unable to meet its debts as they became due, but its assets were not sufficient, as we have before seen, to pay its debts. Their counsel argue that it was not insolvent because the residue of the unpaid seventy *per cent.* of stock subscrip-

tions was more than sufficient, with its other assets, to pay all of its debts, after rescinding the stock subscriptions of these three stockholders. They seem to forget that the stockholders denied the right of the company to collect any part of this seventy *per cent.* of unpaid stock, and that the company admitted that it had no such right. In determining the solvency or insolvency of a joint stock company only such unpaid stock subscriptions as the company has the right to collect can be estimated, and not those which it has no right to collect, but which its creditors under certain circumstances may subject to the payment of their debts. To hold that the stockholders who instituted separate suits for the rescission of their contracts were entitled to relief, and that the other appellants were not, would be, under the facts of this case, to sacrifice substance to form, and to relieve one class of stockholders at the expense of another, when their rights and equities were the same. Neither class, in our opinion, is entitled to relief upon the ground that the subscription contracts were procured by fraud, as against the creditors whose debts were decreed to be paid.

It is also insisted that the creditors had notice of the guaranty of the company that no more than thirty *per cent.* of the stock subscribed should be called for, and for this reason they are not entitled to subject the unpaid stock subscriptions beyond that amount to the payment of their debts.

It clearly appears that J. T. Crabtree, one of the creditors, had notice of this guaranty. He was the original and one of the chief promoters of the land company scheme, was one of its incorporators, its first president, and a party to the agreement by which the guaranty was made. The lower court probably held that he had no right to call upon the other stockholders to contribute to pay his debt, and so decreed.

Two of the other creditors, the Misses Jack and the Pittsburg Bridge Company, were also stockholders of the company, and for that reason it is insisted that they also had no-

tice of the guaranty and cannot call for further payment from the appellants.

The debt of the Misses Jack was for the purchase price of the land owned by the company. It clearly appears that their subscription to the stock of the company was made some days after their conveyance to it; that they met Crabtree, the president of the company, on the street, who asked them to subscribe for stock, which they did; that they had not then seen and never did see a prospectus or subscription list, never had a certificate for stock, nor had any knowledge of the guaranty when their debt was contracted.

Neither is there any real foundation for the claim so persistently made that the Misses Jack were parties to the fraud from which the stockholders seek relief, and that they are therefore not entitled to have their purchase money paid them. The evidence fails to show that they were in any way connected with it.

The Pittsburg Bridge Company, more than a year after the land company was organized, entered into a contract with it to build a bridge, for which the bridge company was to receive $7,000, to be paid upon the completion of the work—forty shares in the paid-up stock of the land company, and the residue in cash, or its equivalent. It was not a subscriber to the stock of the land company, and did not become a shareholder until after the work was done, and its debt was due. It was not shown to have had any knowledge of the guaranty until long after its debt was contracted. In fact, it appears from the evidence of the agent of the bridge company, who made the contract, that it did not have knowledge of it until afterwards.

The other creditor, the Bank of Salem, was not a stockholder, but two of its directors were stockholders and directors in the land company. They of course knew of the guaranty, and this, it is claimed, was sufficient to charge the bank with notice. It clearly appears that neither Bowman nor

Preston, the directors referred to, acted as officers of the
bank when the bank debt was contracted.    They were both
endorsers upon the notes, and could not properly act as direc-
tors when the contract was made.    Code, sec. 1122.    The fi-
nance committee of the board of directors of the bank, con-
sisting of its president and two other members, authorized
the loan to be made.    Their depositions were taken, and they
prove that when the loan was made they knew nothing of the
guaranty, and that Bowman and Preston did not act as direc-
tors of the bank when it was made.

A corporation is not affected by the knowledge of an agent,
when he himself contracts with it or otherwise deals with it in
a transaction in which his interests are opposed to the inter-
ests of the company, for in such a transaction he could not
represent the company.    Where two companies have the
same person as director, and enter into dealings with each
other, the knowledge of the common director cannot be at-
tributed to either company in a transaction in which he did
not represent it.    *Railway Co.* v. *Thames & Mersey Ins.
Co.*, 2 Ch. Appeal Cases, 617-18; *Innerarity* v. *Merchants
Nat. Bk.*, 139 Mass. 332 (52 Am. Rep. 710); *Le Neve* v.
*Le Neve*, 2 White & Tudor's L C., 169-174.    See 1 Mora-
wetz on Corp., sec. 540c; 2 Cook on Stocks & Stockholders,
sec. 727 and notes; 4 Thompson on Corp., sec. 5214; Story
on Agency, secs. 140, 140a and 140b.

It not appearing that either the Bank of Salem, the Misses
Jack, or the Pittsburg Bridge Company had notice of the
guaranty, they were entitled to have their debts satisfied out
of the unpaid subscriptions for stock, and the lower court
properly so decreed.

It is also assigned as error that the amount decreed against
A. M. Bowman and J. T. Crabtree respectively is not equal
to twenty *per cent.* of the stock subscribed for by them, as
shown by the commissioner's report, which was confirmed.
The amounts stated in the report and in the decree are not

written in full, but are stated in figures only. It is more than probable that there is in fact no error as to those items, and that what appears to be an error is the result of a mistake in copying.

Without passing upon this question, the decrees will be affirmed in all other respects, with direction to the Circuit Court, when the cause is remanded, if there be error in the decree against Bowman and Crabtree, respectively, in the respect named, to render such decree against them as ought to have been rendered.

In the view we have taken of the case, it becomes unnecessary for us to pass upon the motion of the appellees to dismiss the appeal as to the appellants whose stock subscriptions were each less than five hundred dollars.

*Affirmed.*