# Wytheville

## THE L. E. MUMFORD BANKING CO. v. FARMERS AND MERCHANTS BANK OF KILMARNOCK

June 11, 1914.

1. PLEADING—*Assumpsit—Sworn Plea—Object—Waiver.*—The purpose of the statute requiring the defendant to swear to his plea, where the plaintiff in assumpsit has sworn to his account, is to prevent delay where no real defense exists, but the provision was enacted for the benefit of the plaintiff and may be waived by him, expressly or by implication, or he may, by his conduct, be estopped to take advantage of it.

2. PLEADING—*Office Judgment—Postponement by Consent.*—If, upon the request of the plaintiff, the defendant consents to the postponement of a case until a later day of the term, and the court adjourns before that day arrives, the office judgment which would otherwise have become final on that adjournment of the court does not become final, and the defendant may enter his sworn plea to the merits at the next term of the court.

3. JURORS—*Qualification—Indebtedness to a Party.*—The fact that several jurors are indebted to a bank does not disqualify them to sit in a case to which the bank is a party, if they have formed no opinion of the case, are free from bias or prejudice and are otherwise qualified jurors. It is immaterial that more than one of them are so indebted.

4. CORPORATIONS — *Officers—Authority—Ostensible Powers—Holding Out.*—The authority of an officer of a corporation is the authority which his company holds him out to the public and those dealing with it as possessing. This is his real authority, and no secret limitations of this in the by-laws of the company or elsewhere are binding on third persons who deal with him as the representative of his company. Whether or not there was a holding out and the extent and measure of it, and whether there was a subsequent ratification, and acceptance of benefits derived from contracts made by such officer, are questions for the jury under proper instructions of the court.

29

Error to a judgment of the Circuit Court of Lancaster county in an action of assumpsit. Judgment for the defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*James E. Heath,* for the plaintiff in error.

*J. W. Chinn, Jr.* and *J. T. Downing,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The L. E. Mumford Banking Company, a Virginia corporation (hereinafter called the plaintiff) having its principal place of business at Cape Charles, Va., had, prior to the year 1909, conducted a branch bank in the village of Kilmarnock, in Lancaster county, and during the early part of that year certain persons, for the most part citizens of said county, having obtained a charter so to do, organized under the corporate name of the Farmers and Merchants Bank of Kilmarnock, Inc., to conduct a banking business at Kilmarnock, and very soon thereafter the said bank (hereinafter called the defendant) purchased from the plaintiff, pursuant to an agreement theretofore entered into between the plaintiff and the defendant's organizers, the plaintiff's assets and the good will of the business at Kilmarnock. After the organization of the defendant bank it became indebted to the plaintiff in a sum exceeding $40,000, which indebtedness was from time to time reduced until it amounted to but $4,000 as of December 27, 1910. On that day the defendant sent to the plaintiff a check for $767.25 and several notes held by it made by certain parties named Goad (called in this record the "Goad notes") in settlement of said indebt-

edness, the defendant claiming that when it was organized the plaintiff bank had made an agreement with it whereby defendant was entitled to make this settlement. Plaintiff accepted the check, collected the money on it and gave defendant credit therefor, but declined to accept the Goad notes, claiming that the alleged agreement made by its then president (L. E. Mumford) had never been reported to the plaintiff and was absolutely void, and demanded the balance of the indebtedness due to it, to-wit, the difference between $4,000 and the check for $767.23, amounting to $3,232.77, which, as it seems, was the sum due on the Goad notes. The defendant refused to make any other settlement than the one it had attempted to make; whereupon, plaintiff instituted this action against it for the recovery of the balance claimed by the plaintiff to be due it as above stated.

The action was instituted in the Circuit Court of Lancaster county in June, 1911, the process being made returnable to the first July, 1911, rules of the court, held on the first Monday in July, which process was duly served on the defendant, and at the first July rules, to which the process was returnable, the plaintiff filed its declaration containing the common counts in *assumpsit*, having annexed thereto an account and an affidavit, pursuant to sec. 3286 of the Code. There was no appearance for the defendant at said rules, and the clerk accordingly entered the common order. At the second July rules, duly held, the defendant still failing to appear, the common order was confirmed, but instead of placing the case on the office judgment docket, the clerk inadvertently placed it on the issue docket and noted a writ of inquiry. It appears that neither the plaintiff nor its counsel was aware of the fact that the July term of the court was not a term designated for the trial of civil causes, and consequently they prepared to be present for the trial of the action at

that term, commencing on the third Monday in the month, but subsequently plaintiff's counsel was notified by the clerk that the July term was not a term for the trial of civil causes, and that he need not be present, which notice from the clerk was in response to a letter received by him from plaintifl's counsel of date eleven days before the July term began, saying that it was his purpose to leave Norfolk on July 17, which was the first day of the term, reaching the court on the 18th, the second day of the term, as it would be very inconvenient for him and his client, the then president of the plaintiff bank, to appear sooner, and the counsel requested the clerk to show his letter to defendant's counsel and arrange with him for a continuance of the case until the second day of the term. The clerk did exhibit the letter to defendant's counsel who was in attendance upon the court on the first day of the July term, and when the case was called advised the court of the request of plaintiff's counsel and of all that had transpired between counsel, but as the court was in session only a few hours on July 17, it entered an order stating ''for reasons appearing to the court, the following cases are continued to the next term,'' naming this case, and adjourned for the term on that day.

At the next term of the court, commencing on the third Monday in September, 1911, the plaintiff appeared by counsel and moved the court that judgment in its favor be entered for the amount claimed in its declaration, with interest from December 27, 1910, and costs, on the ground that its office judgment had become final by reason of the defendant's failure to plead at the July term, which motion was resisted by the defendant on several grounds, and, after having been argued by counsel, was taken by the court under advisement and so held until March 19, 1912, when it was overruled. To this

action the plaintiff excepted, and the pleadings in the cause were then made up, the defendant contending that by virtue of the above mentioned agreement with the plaintiff bank it had the right to apply and properly applied the Goad notes to the extent of their face value in part settlement of its indebtedness to the plaintiff. Defendant also filed a plea of set-off, claiming that it had inadvertently paid over to the plaintiff certain profits which it should not have paid, and that it was entitled to recover the same of the plaintiff. The verdict of the jury was for the defendant upon its defense with respect to the Goad notes, but against it on its plea of set-off, which verdict the court interpreted as meaning that the plaintiff recover nothing of the defendant and that the latter recover nothing from the former, except for costs, and accordingly entered judgment on the verdict, to which judgment the plaintiff obtained this writ of error, assigning in its petition therefor four errors in the rulings of the trial court, including its refusal to set aside the verdict of the jury because contrary to the law and the evidence.

The first error assigned is the refusal of plaintiff's motion at the September term of the court, 1911, for a judgment against the defendant for the amount claimed in the declaration, the ground of the motion being that plaintiff had filed with its declaration the affidavit required by section 3286 of the Code, and no plea was filed to the declaration at either the first or second July, 1911, rules, or at the succeeding July term of the court, and that, therefore, plaintiff was entitled to have final judgment entered in its favor for the full amount of its claim.

The purpose of the statute, as this court has repeatedly said, is to prevent delay to the plaintiff caused by continuances upon dilatory pleas when no real defense exists, and to require the defendant to make oath to his defense

before his plea will be received. But this requirement of the statute was manifestly imposed for the benefit of the plaintiff and may be waived by him expressly or by implication, or he may be by his conduct estopped to take advantage of it. *Jackson* v. *Dotson,* 110 Va. 46, 65 S. E. 484; *Carpenter* v. *Gray,* 113 Va. 518, 75 S. E. 300; and cases cited.

The letter of plaintiff's counsel to Chilton, clerk, above referred to, clearly indicated that he and his client understood that a *bona fide* defense to this action was to be made, and that the case was not to go to office judgment at the July term, hence the request that there be a continuance of it from the first day of the term to the second day thereof, the letter requesting that it be by the clerk shown to defendant's counsel and that the clerk arrange with defendant's counsel for a continuance of the case to July 18, the second day of the term. Defendant was in no way responsible for the court's remaining in session only a few hours on the 17th and on that day adjourning for the term. If the plaintiff were entitled to a judgment because the affidavit was not filed at such term, unquestionably its consent, in fact, its request, that the case be continued to a later day in the term is to be given as much force as constituting a waiver then as at any other time.

In *Pollard & Haw* v. *Am. Stone Co.,* 111 Va. 147, 68 S. E. 266, it was held that if the plaintiff agrees to postpone the trial of the case to the next term of the court, or to a later day of the term at which the office judgment would become final, he will be held to have waived the plea and affidavit required by the statute, and the agreement need not be entered of record.

The reasoning of that case applies with peculiar force to the facts and circumstances appearing in the record now before us, for though the plaintiff should not be

considered as having expressly or impliedly consented that the case be continued to the September term of the court, it not only consented, but for the convenience of its president and counsel requested that the case be not taken up on the first and only day that the court was held at its July term, and the result of the trial had at a later day shows that the defendant had a meritorious defense and was not seeking a postponement for the purpose of delay or with the object of taking advantage of the plaintiff to any extent. It would indeed be a harsh application of the statute in question to permit the plaintiff here to take advantage of defendant's failure to file its plea and affidavit on the only day the court was open to it to do so, when the plaintiff itself not only consented but requested that the case go over from that day.

The second assignment of error calls in question the propriety of the court's ruling, accepting, over plaintiff's objection, four veniremen who stated on their *voir dire* that they were indebted to the defendant bank.

There is no merit in this assignment of error. The plaintiff's bill of exceptions sets forth that the veniremen in question stated upon their *voir dire* that they had formed or expressed no opinion; that they were sensible of no bias or prejudice for or against either party to the suit; that they could give a fair and impartial trial; and that the fact that they were indebted to the defendant bank placed them under no obligation to the bank except as borrowers of money, in the ordinary course of business, and that they would be in no way influenced by reason of that fact.

That there were four of these jurors instead of only one, does not differentiate the case, as is contended for plaintiff, from that of *Richardson* v. *Planters Bank,* 94 Va. 130, 26 S. E. 413, in which this court said: ". . to

hold, as a legal presumption, that such a relationship would be likely to warp the judgment, would be, in our opinion, to estimate too cheaply integrity under the sanctity of an oath.'' See also *Thompson* v. *Douglas,* 8 Leigh (35 Va.) 337, 13 S. E. 1015.

When the testimony in the case had been concluded, the plaintiff asked for three instructions, and the defendant for one. Two of plaintiff's instructions, as asked, were given, but the court, over the objection of plaintiff, amended its third instruction and gave the same as amended, and also gave the only instruction asked by the defendant.

Plaintiff's instruction, which the court amended, told the jury that the committee appointed by the parent bank (L. E. Mumford Banking Co.) for the purpose of representing its interests in regard to the organization of the defendant bank, were special agents; that those dealing with them were bound to inform themselves as to the extent of said committee's powers, and as, by the terms of the resolution appointing this committee, it was required that at least three of the five composing it should act and no individual member of the committee, acting alone, had any authority whatsoever. "All three of said committee were required to pass upon any matter arising in regard to said organization. Not only is this true, but neither the said committee, nor any of its members, had any right to delegate its or their authority to any particular member of the committee. If, therefore, the jury believe from the evidence that Mr. Mumford, a member of the committee, acting alone, attempted in the name of the plaintiff bank to enter into any contract with the defendant bank, or with its organizers, such action on his part was, so far as the plaintiff bank was concerned, absolutely void, and the said bank is not bound thereby.''

The amendment to this instruction by the court was to

add at its conclusion, as asked, the following clause, ''unless the jury further believe from the evidence that the benefits of the contract made by L. E. Mumford with the defendant bank were intentionally accepted by the plaintiff bank without inquiry, or the plaintiff bank ratified and confirmed said contract; in either of which cases the plaintiff is bound by said contract, though the jury may believe from the evidence that said L. E. Mumford was unauthorized to make it.''

Defendant's instruction given, and which is complained of by the plaintiff, was as follows: ''The court instructs the jury that one who accepts the benefits of a contract made for him by an unauthorized agent is bound by the contract, and the representations made by such agent to induce the contract, and must take such contract as made with its burdens as well as its benefits. And even though the jury believe from the evidence in this case that L. E. Mumford was unauthorized by the board of directors of the L. E. Mumford Banking Company to assume the 'Goad Notes' in behalf of plaintiff bank, if they further believe from the evidence that the plaintiff bank took the benefits of the contract made in its behalf with the defendant bank, said L. E. Mumford Banking Company is bound by the contract made by Mr. Mumford.''

The evidence in the case tended to prove the following facts: In the year 1900 the plaintiff bank began to establish branch banks at divers points in the Northern Neck and other sections of Tidewater Virginia, and among the first of the twelve of such branches established was the branch at Kilmarnock, in Lancaster county, where the business was conducted as ''The L. E. Mumford Banking Co. at Kilmarnock, Va.'' and under the charter and corporate name of the parent bank, but separate books were kept and the business done in the main as if they were

separate and independent institutions. None of the capital of the parent bank was used at its branches, the business being done there solely on the deposits, except when it became necessary to obtain money from the parent bank, which money when obtained was carried on the books of the branch as a credit to the parent bank, and on the books of the latter as a loan. The banking house, furniture, fixtures and all other tangible property used by the Kilmarnock branch were paid for out of the deposits at that point and carried on its books as a resource.

In the latter part of 1908 Mumford, who founded the parent bank, and had been its president from the time of its creation, apprehending trouble and competition in his company's business in the Northern Neck, concluded to make an effort to convert his several branch banks into independent banking institutions under separate corporate names and charters, and first unfolded his plans to W. T. James, who had been cashier of the Kilmarnock branch ever since it was established. James, it seems, at first opposed the plan, but finally consented, at Mumford's request, to consult J. B. Cralle, W. G. Eubank and W. E. Hathaway, who had all along been closely connected with the business at Kilmarnock, and to advise him (Mumford) as to prospects for carrying out the latter's plan. James did this and wrote Mumford that he and the parties named would take up with him the question of organizing an independent bank, as he desired. It was then, and for the first time, that Mumford made known his plans as to the conversion of the branches into independent banks to his board of directors, to which plans the board readily assented, and at a meeting of the board held at Cape Charles on December 31, 1908, a resolution was adopted appointing Mumford, R. L. Ailsworth, J. V. Moore, and two others, any three of whom

might act, and Mumford to be chairman, "to make any disposition of the branches of the company, or any of them, that may desire to establish independent banks, on such terms and in such manner as they may deem best for the interests of the L. E. Mumford Co."

On January 4, 1909, Mumford, Ailsworth and Moore met Hathaway, James, Cralle and Hubbard in Hathaway's office, at White Stone, for the purpose of devising plans for the organization and establishment of an independent bank to take over the business of the parent bank at Kilmarnock. At this conference, according to the evidence given by Hathaway, Hubbard, Cralle, James and Mumford in this cause, it was agreed: That the capital of the new bank should be $25,000; that the parent bank should take $13,000 of this capital stock, and the other parties present should take the remaining $12,000, with the understanding that the greater part of it should be distributed to the best advantage within the zone of the bank's business dealings; that the par value of the stock should be $100 per share, but the price to be paid for it should be $125 per share; that 100 *per cent* of the money for which the stock was to be sold should go into the bank's treasury, and the premium of 25 *per cent,* or $25 per share, should go to the parent bank for the good will of the business; that the new bank proposed should take over the business of the parent bank at Kilmarnock as it then stood on its books—that is, should take all assets, including banking house and fixtures, cash on hand, money due from other banks and bills receivable, and assume all liabilities, such as money due depositors and other banks, including $42,000, which was then carried on its books to the credit of the parent bank at Cape Charles, except the Goad notes held by the Kilmarnock bank and carried on its books as a resource, amounting to $2,934.93 of principal. It further appears that the

makers and endorsers of the Goad notes had several years before become bankrupts and the notes had already been credited with their full *pro rata* share of the proceeds of the estates of the bankrupts, and that it was well known to James, cashier of the bank, to Hathaway, who had acted as attorney in the bankruptcy proceedings, to Mumford, president of the company, and to Cralle, that these notes were absolutely worthless and uncollectable; therefore, when the question of the taking over of the bills receivable held at Kilmarnock was reached in the meeting in Hathaway's office, he, as spokesman for the Kilmarnock people interested, stated that the Goad notes were worthless and that they would not take them with the assets of the bank, and at the same time stated that he knew of other notes which he did not consider good, but it would require an examination of all the paper held at Kilmarnock before it could be determined what other paper would be unacceptable to the proposed new bank, and the meeting adjourned with the understanding that the Goad notes, as defendant contends, should be excluded from the transfer of the assets to the new bank; that a charter for this new bank should be procured, and when notified the Cape Charles committee should come to Kilmarnock, the paper there examined, and it should then be decided whether there was any other paper (besides the Goad notes) which should be excluded from the transfer, and when that matter was disposed of the new bank should be organized and the transfer made, it being also agreed that if any of those then present should be unable for any reason to attend the meeting later to be held those who did attend should carry out the agreement thus made as to the bank's paper and other details of the transfer.

Subsequently, a charter having been obtained for the new bank, James notified Mumford, chairman of the

Cape Charles committee, as agreed, who in turn notified Ailsworth and Moore, but they failed or refused to go with him and Mumford alone went on February 23, 1909, to Kilmarnock, where he met Hathaway and his associates representing the parties interested in the new bank and went over the old bank's paper with them, and after going over this paper in detail with Mumford, Hathaway and his associates finally agreed to take over all the bills receivable carried at Kilmarnock except the Goad notes, and at the earnest solicitation of Mumford, for the accommodation of the parent bank, Hathaway and James agreed that they would make an effort to induce the Goads to make new notes and to carry them on the books of the new bank in order that an effort might be made to collect something on them for the benefit of the parent bank. In order to induce Hathaway and James to do this, it was further understood and then agreed that the new bank could retain a sufficient amount of the money owing the parent bank at Cape Charles, without interest, to offset the amount represented by the Goad notes and could charge those notes up to the parent bank whenever it was desirable to do so. The new bank was thereupon duly organized, with Mumford as one of its directors, and opened for business on March 1, 1909. Afterwards James succeeded in getting the Goads to execute five several notes, payable to the order of themselves at "The L. E. Mumford Banking Co. at Kilmarnock, Va.," one, two, three, four and five years after date, respectively, and being in renewal of the old notes known as the Goad notes. As stated, the new bank reduced its indebtedness to the parent bank from time to time, paying interest on all but the $4,000 reserved to cover the Goad notes, so that the balance amounted to only about $4,000.

In July, 1910, the board of directors of the new bank (defendant in this suit), learning that Mumford might

resign from the presidency of the parent bank, and therefore deeming it best to have in writing something to confirm the understanding between the two banks in reference to the Goad notes, directed its cashier, James, to write Mumford about it, and on July 9, 1910, Mumford signed as president a paper writing, witnessed by Parsons, the then cashier and secretary of the plaintiff bank, which he considered sufficient to answer the purpose that James' letter to him had in view. Mumford resigned as president of the plaintiff bank August 1, 1910 ,and was succeeded by R. Fulton Powell, who made demand upon the defendant bank for the payment of the $4,000 reserved by the latter to cover the Goad notes, and after certain dealings were had between the parties, already mentioned above, this suit followed.

We have thus set out, perhaps at greater length than was necessary, the facts which the evidence in the case tended to prove, in order that what is to be said with respect to the trial court's rulings complained of, in amending plaintiff's third instruction and in giving the instruction asked by the defendant also quoted above, may be understood.

It will be observed that plaintiff's said instruction was predicated only on a part of the evidence and embraced only plaintiff's theory of the case, and wholly ignored a material part of the evidence and defendant's theory of the case—that is, the instruction as asked left out of view all the evidence tending to show the contract in regard to the Goad notes when all three of the committee representing the plaintiff were present at the meeting at White Stone, all evidence as to Mumford's implied authority to make the contract that the Goad notes were to be excluded from the assets of the parent bank to be taken over by the defendant from the course of plaintiff's dealings, and all evidence as to the subsequent rat-

ification of the contract and the acceptance of its benefits. In these circumstances it was entirely proper that the court should amend the instruction as it did, and to give defendant's instruction, *supra*. What was the contract or agreement of the parties, if any, with respect to the Goad notes, or whether Mumford had implied authority to make the contract alone from the course of plaintiff's dealings with the public, and especially with the representatives of the defendant, or whether there had been a subsequent ratification of the contract and acceptance of its benefits by the plaintiff, were all questions of fact for the jury to be determined from all the evidence in the case bearing upon these issues. *Strauss* v. *Richmond Woodworking Co.*, 109 Va. 724, 65 S. E. 659, 132 Am. St. Rep. 937; *Douglas Land Co.* v. *Thayer Co.*, 107 Va. 292, 58 S. E. 1101.

There is evidence in this case tending to prove not only that it was understood at the meeting at White Stone on January 4, 1909, when Mumford, Ailsworth and Moore were all present, that the Kilmarnock parties would not enter into the organization of a corporation to take over the plaintiff's business at that point if the Goad notes were to be unloaded on the new bank, and that it was then and there agreed that these notes were to be excluded from the bills receivable to be taken over by it, but to prove also that by its course of dealing with the public and especially with those representing the defendant bank, the plaintiff held Mumford out as possessing all necessary authority to bind it by an agreement that the defendant was not to be required to include the Goad notes as a part of the assets to be taken by it. There is no evidence even tending to show that the parties dealing with plaintiff bank had any knowledge whatever of the resolution adopted December 31, 1908, appointing a committee to convert its

branches into independent banks, but there is evidence affirmatively proving that they knew nothing of this resolution. Not only so, it is shown by the evidence given by plaintiff's witnesses, as well as by defendant's witnesses, that Mumford had alone established all the branch banks in the Northern Neck, and had exercised, with the consent of his company, exclusive management and control of them from the beginning; that all the dealings of the people of the Northern Neck with L. E. Mumford Banking Co. had been with Mumford alone; that they looked to him alone, and had never known his board of directors to assume any authority or control in the management of the company's business; that he had made all contracts connected with the company's business on his own judgment and without any restrictions upon his powers and authority; that Mumford decided upon and took up alone the conversion of the parent bank's branches into independent banks without consulting his board, they readily agreeing to his plans when he saw fit to divulge them; and disposed of alone all of these branches except what was done on the occasion of his visit with Ailsworth and Moore to White Stone and Warsaw.

"The authority of an officer of a corporation is the authority which his company holds him out to the public and to those dealing with it as possessing. This is his real authority, and no secret limitations of this in the by-laws of the company or elsewhere are binding on third persons who deal with him as the representative of his company." *Pine B. Co.* v. *Columbia Co.,* 106 Va. 810, 56 S. E. 822; *White Hall Co.* v. *Hall,* 102 Va. 284, 46 S. E. 290; *Whitten* v. *Bank, &c.* 100 Va. 546, 42 S. E. 309; 3 Cook Corp. (6th ed.), p. 2289, and cases there cited.

The contention in this case is, not that Mumford did not by the past course of dealing on the part of the plaintiff bank have authority to transfer the business of the

Kilmarnock branch to the defendant, but merely that he had no authority to agree that the Goad notes should be excepted from the transfer and retained by his own bank in order to consummate the proposed deal.

We are of opinion that the instructions given by the court submitted to the jury fairly, and as favorably to the plaintiff as it could reasonably have asked, the issues of fact, and that a further discussion of the evidence, which it is ample to sustain their finding, is unnecessary. The judgment of the circuit court is affirmed.

*Affirmed.*