## Richmond

PLANTERS BANK AND TRUST COMPANY *v.* NORMAN A. LOE AND
ELVA LOE.

March 10, 1952.

Record No. 3903.

Present, Hudgins, C.J., and Eggleston, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Langhorne Jones* and *Hardee Chambliss, Jr.,* for the plaintiff in error.

*Richardson, McCandlish & Lillard,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

This writ of error brings under review the validity of a judgment entered on a jury's verdict in favor of Norman A. Loe and Elva Loe against Planters Bank and Trust Company in an action for damages for the breach of an alleged oral agreement entered into between the Loes and the bank, acting through its president, Francis F. Shurling, with respect to a building contract which the Loes had made with Delta Housing Corporation.

In the trial court the bank defended the action on the grounds that: (1) The alleged oral agreement was unenforceable under the statute of frauds in that it was a promise on the part of the bank to answer for "the debt, default, or misdoings" of Delta Housing Corporation (Code, § 11-2(4)); and (2) that its president was without actual or implied authority to enter into the oral agreement or promise sued on. The same contentions are made before us.

There is little conflict in the evidence which may be summarized thus:

On July 19, 1948, the Loes entered into a written contract with Delta Housing Corporation whereby the corporation agreed to sell, and the Loes agreed to buy, a lot in Delta Subdivision in Fairfax county, Virginia, with a house thereon to be constructed, pursuant to plans and specifications, by the Delta Corporation.

The purchase price of the property, including the completed building, was $16,500. Of this amount $4,500 was to be paid in cash, partly upon the execution of the contract, partly during the progress of the building, and the balance upon its completion.

The balance of $12,000 was to be paid from the proceeds of a "mortgage" on the property which the vendor agreed that it would "exercise *his* best efforts to secure." Although the contract specified no definite date for the completion of the building, the Loes testified, and it is undisputed, that the parties agreed that the house was to be completed by April 1, 1949.

In July, 1948, the Loes made down payments on the contract amounting to $1,500, at which time work had begun on the house and was "in the basement stage."

At the same time the Delta Corporation was building other houses in the subdivision under similar contracts, and the Planters Bank and Trust Company, whose principal office was at Chatham, Virginia, was assisting the Delta Corporation in financing the construction of these projects.

By January 1, 1949, no further work had been done on the Loe house. The Delta Corporation, which was heavily indebted to the bank, was in financial difficulties and unable to get the necessary funds to proceed with the completion of the Loe house and its other construction contracts..

On January 12th the Loes and other parties who had similarly contracted with the Delta Corporation for the construction of houses in the sub-division, at the request of Delta Corporation, attended a conference at its office to discuss means of financing the completion of these houses. Besides the Loes and the other interested purchasers, there were present at this meeting the president and treasurer of Delta Corporation, Francis F. Shurling, the president of Planters Bank and Trust Company, and Charles H. Burton, a member of the District of Columbia bar, who was acting as counsel for the bank.

At that meeting Shurling, as president of the bank, suggested the following plan for financing the construction of the Loe house and other houses in the vicinity which the Delta Corporation had agreed to build:

The Delta Corporation was to deed the lots to the several purchasers who would execute notes secured by deeds of trust on the properties, representing the deferred portions of the purchase prices. These notes were to be discounted by the bank and the proceeds thereof paid by the bank to the Delta Corporation on a "progress—payment basis," for the completion of the houses. As Loe expressed it, Shurling said "that at no time would the bank put out more money than progress on the houses

indicated, and \* \* \* that at all times there would be enough money withheld from those loans to see to it that the houses could be finished by another contractor in case Delta defaulted, thereby assuring us of having the houses completed."

Thomas J. Pearsall, who had contracted to purchase one of the houses, thus related the offer made on behalf of the bank: "In order to protect us, Mr. Shurling, who represented himself as the president of the Planters Bank and Trust Company, stated that the bank would assure us that our homes would be constructed, that they would withhold money until the homes had been constructed, that they would set up a schedule of payments, they would advance to Delta certain amounts of money when actual parts of the house had been completed; when the roof was on, a certain fixed amount, possibly one thousand dollars—I don't recall the figure—was to be advanced; when the plumbing and wiring were to be installed, another amount would be advanced to Delta; when the house was plastered, so much would be advanced, and all down to the details when the radiators were in, the house was landscaped and we were ready to move in, and Mr. Shurling assured us that he would give us that information in writing to protect our interest."

Shurling assured the Loes and the other purchasers that the bank had employed a competent supervisor who would make progress reports to the bank on the construction of the houses and that payments would be made on this basis.

There is no dispute as to the terms of the proposal made by Shurling, nor is it denied that these terms were accepted by the several purchasers.

Pursuant to this arrangement the Delta Corporation conveyed the property to the Loes, who in turn executed installment notes in the principal sum of $12,000, secured by a deed of trust on the property. These notes were delivered to the bank and were paid by the Loes as they fell due.

It is also undisputed that the bank breached its contract to disburse the money as the building progressed, and on the contrary, on January 15, 1949, without the knowledge or consent of the Loes, placed the entire proceeds of the $12,000 loan to the credit of the Delta Corporation. At that time the house was still "in the basement stage" of construction. The record does not show what disposition was made by the Delta Corporation of these funds.

Early in February, 1949, Delta Corporation executed a written assignment of its interest under the Loe contract to the bank. The Loes consented to this agreement and thereafter, except in one instance, paid to the bank the amounts which they were obligated to pay to the Delta Corporation. One payment of $500 was, with the consent of the bank, made to the Delta Corporation for the purpose of meeting a pay roll.

For a time work on the house proceeded satisfactorily and the Loes were able to move in on September 9, 1949. But the building had not then been completed in accordance with the plans and specifications. The Loes made frequent complaints of this both to the Delta Corporation and representatives of the bank. On September 10th Loe wrote Burton, the attorney for the bank, calling his attention to more than one hundred items which needed completion or correction in order to bring the building up to the required specifications. Despite these demands the house was not completed.

In February, 1950, the Loes recovered a judgment of $1,513 against the Delta Corporation for the cost of completing their house, and being unable to collect this judgment, instituted the present action some months later against the bank. It is agreed that $1,513 is the measure of the liability, if any, of the bank to the Loes.

We agree with the ruling of the trial court that the oral agreement sued on is not within the statute of frauds. For the statute to apply it is essential that the oral promise be to perform the same duty or obligation which rests upon another person. In other words, the oral promisor must have undertaken to discharge the same obligation or debt which another person has undertaken to discharge. 49 Am. Jur., Statute of Frauds, § 68, p. 422; Williston on Contracts, Rev. Ed., Vol. 2, § 465, p. 1341; *Id.*, § 475, p. 1369. A simple illustration of such a promise is where the oral promisor agrees to pay a debt which another person has agreed to pay. That was the situation in *Lawson* v. *States Construction Co., post*, p. 513, 69 S. E. (2d) 450.

But in the case now before us the oral promise on the part of the bank was not to discharge the same obligation which the Delta Corporation had incurred. The Delta Corporation had agreed to construct the building according to plans and specifications. In its oral agreement with the Loes the bank had no such

undertaking. It did not agree to construct the building or guarantee that the Delta Corporation would do so.

The bank entered into a separate contract with the Loes whereby it agreed to lend them $12,000 in return for their notes secured by a deed of trust on the property. The money derived from this loan was the property of the Loes. The bank agreed that it would hold this money in trust and pay it to the Delta Corporation as the work on the building progressed, always retaining sufficient sums to finish the house in the event the Delta Corporation did not do so. It agreed to keep on the job a competent supervisor who would report to it progress on the construction of the house, and that payments would be made on these reports.

This undertaking on the part of the bank was supported by a valuable consideration. In return for its promise the bank received the Loes' notes, bearing interest and secured by a deed of trust on the property. Had the bank lived up to its agreement and disbursed the money only as the work thereon warranted, its security would have been protected. The arrangement was also beneficial to the bank in that it afforded the bank an opportunity of reducing the Delta Corporation's debt to it.

It is thus clear that the oral agreement which the bank entered into with the Loes was an independent contract, separate, distinct and different from that which the Delta Corporation had made with the Loes, and was based on a different, but none the less valuable consideration. Consequently it was not within the statute of frauds.

Little need be said of the bank's contention that there was no evidence that the president had the authority to enter into the contract sued on. As has been said, at the time the agreement was entered into, on January 12, 1949, Delta Corporation was heavily indebted to the bank. It was to the bank's interest that the Delta Corporation be kept a going concern and given an opportunity of repaying or reducing its indebtedness to the bank. For that purpose the president came to the meeting, accompanied by the bank's attorney, and made such arrangements with the Loes and the other purchasers of the houses under construction as were deemed to be to the bank's advantage. Thereafter the bank, with full knowledge of the situation, accepted the benefits of the transaction. It continued to advance money to the Delta Corporation for constructing these houses. It re-

tained and still retains the Loe notes and has been collecting them as they fell due. Clearly this constituted a ratification of the transaction which binds the bank as effectively as if its president had been expressly authorized to enter into the agreement. 7 Am. Jur., Banks, § 230, p. 171; *Mumford Banking Co.* v. *Farmers, etc., Bank,* 116 Va. 449, 457, 82 S. E. 112.

The undisputed evidence is that the bank breached its contract with the Loes almost as soon as it was made by placing the entire proceeds of the loan at the disposal of the Delta Corporation. Since the quantum of damages is not in dispute, we are of opinion that the judgment complained of is plainly right, and it is

*Affirmed.*