Richmond.

## RADFORD WATER POWER COMPANY V. DUNLAP.

### December 1, 1920.

1. MASTER AND SERVANT—*Breach of Contract—Evidence.*—In an action for the breach of a contract of employment, defendant corporation objected to the admission of telegrams and letters between the plaintiff and an alleged agent of the president of the corporation, and to a resolution of the board of directors ratifying the contract of employment, and to plaintiff's testimony as to the contract. It was incumbent on the plaintiff to establish both the contract and breach, and to that end the testimony complained of·was introduced and was relevant and appropriate to the issues presented in the pleadings.

2. FRAUDS, STATUTE OF—*Officers and Agents of Private Corporations—Memorandum Signed by Agent.*—If the president of a corporation was clothed with power to employ a manager for the corporation, and employed one as his agent to conduct negotiations and submit a proposition to plaintiff, then the acts of the agent were the acts of the president, and any memorandum, note,·or contract signed by him was a memorandum, note, or contract signed by the party to be charged.

3. EVIDENCE—*How Issue of Fact Established—Officers and Agents of Private Corporations.*—Whether or not one who employed plaintiff as manager of a corporation was the agent of the president, whether certain parties were respectively officers of the company, the one the president and the other a director, whether they were empowered to make a contract binding the company, and whether one or both of them did make such a contract, and what were the terms of that contract, if one was made, are chiefly inquiries of fact. The law does not prescribe in detail how an issue of fact shall be established. To that end all that is required is that the evidence shall be competent and as a whole shall possess sufficient probative value.

4. OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*Authority of Agent of President Employing General Manager of Corporation—Case at Bar.*—In the instant case, an action by the

general manager of a corporation for breach of his contract of employment, the evidence was held sufficient to establish that a third party acted as agent for the president of the corporation in the employment of plaintiff as general manager, and that the president referred to the contract made by such agent with the plaintiff when he informed the directors that he and another director had employed plaintiff as general manager of the company.

5. FRAUDS, STATUTE OF—*Memorandum in Writing—Telegrams.*— A contract made by telegrams is a contract in writing signed by the party to be charged thereby within the statute of frauds.

6. LOST INSTRUMENTS AND RECORDS—*Telegrams.*—Where it appeared from the testimony of plaintiff that he took a copy of an original telegram, which with others formed the contract of employment between him and defendant, but had been unable to locate this copy, and further that he had made an unsuccessful effort to procure a copy from the telegraph company and the defendant, it was competent for the plaintiff to prove the contents of the lost telegram; the same being as effectual for probative purposes under such circumstances as the original.

7. PAROL EVIDENCE—*Agency—Parties to Contract.*—When it is possible to ascertain the essential terms of a contract from the writings of the parties, parol evidence is admissible to apply the contract to the parties, and show the agency of one of the parties signing the contract, memorandum, or note.

8. OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*Employment of General Manager by President—Admission in Evidence of Ratification by Board of Directors.*—Where the president of a corporation made a valid contract of employment on behalf of the company with plaintiff, ratification of that contract by the board of directors, though it might have been unnecessary, was not illegal or improper, and in an action for breach of the contract of employment, it was competent for plaintiff to show from the minutes of the directors what was actually done in that connection. It was not necessary for this ratification to refer in terms to the negotiations between the president, or his agent, and the plaintiff. The contract represented the result of these negotiations, and could be ratified by a simple resolution to that effect.

9. ESTOPPEL—*Limited Ratification of Contract of Employment by Board of Directors of Corporation.*—Where plaintiff entered into a two-year contract at a salary of $2,100 for the first year and $400 additional for the second year, if his services

proved satisfactory, with the president of a corporation to act as its general manager, his mere silence when the directors of the corporation ratified his employment as general manager at $2,100 a year to be paid monthly, did not avoid the two-year contract.

10. OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*Employment of General Manager—Limited Ratification of Contract of Employment by Board of Directors of Corporation.*—The limited ratification by the directors of a corporation of a contract of employment between plaintiff and the president of the corporation did not affect the rights of the plaintiff under the contract originally made, if that was a valid contract not requiring ratification, unless such ratification was acquiesced in by the plaintiff as a change of the contract.

11. OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*Authority of President—Employment of General Manager of Corporation.*— The president of a corporation has power to enter into a contract for two years with one to act as general manager of the corporation. Such a contract is not a contract with respect to the disposition of the company's property nor to change its policies, nor to increase its liabilities for new equipment. It is a contract for the employment of labor for the necessary conduct of the established business of the corporation. The authority to make such contracts for the reasonable execution of the company's business is clearly incidental to the president's office and exists by law and general usage in all cases where the authority of the president is not restricted by special legislation, or by regulations of the company known to the other contracting party.

12. CORPORATIONS—*Presumption of Knowledge of Person Dealing with Corporation—Law of Organization—By-Law.*—Persons dealing with corporations must take notice of what is contained in the law of their organization, and they must be presumed to be informed as to the restrictions annexed by a grant of power by the law by which the corporation is authorized to act. In the instant case, an action by plaintiff against defendant corporation for breach of contract of employment made with plaintiff by the president of the corporation, if there had been anything in the general laws of the State, or the law of the defendant company's organization, which took away or restricted the incidental powers of the president, plaintiff would be presumed to be informed as to the same. But a restriction in a by-law, even if such by-law could be proved by the mere statement of its effect by the president of the corporation, could not be presumed to be known to plaintiff.

Error to a judgment of the Corporation Court of the city of Radford in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*H. C. Tyler* and *Harless & Colhoun,* for the plaintiff in error.

*Jordan, Roop & Sowder,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This case is brought before us by a writ of error to a judgment of the Corporation Court of the city of Radford, entered in a proceeding by motion in which C. C. Dunlap was the plaintiff, and the Radford Water Power Company (the plaintiff in error) was defendant.

The plaintiff, Dunlap (defendant in error), was engaged in business, in the year 1918, in Galena, Ill., when he was approached by one R. J. Hole with respect to taking a position in Radford, Va., with the Radford Water Power Company. The following telegrams and letter passed between Dunlap and Hole:

Hole first telegraphed from Greensboro, N. C., on April 1, 1918, to Dunlap at Galena, Ill.:

"Will possibly have position open as manager in small hydro electric water plant and street railway town of about five thousand in Virginia. Wire me if you will be interested in same."

Dunlap replied from Galena to Hole in Greensboro, on April 6, 1918:

"Write wire your proposition."

Hole replied by telegram to Dunlap on April 6, 1918:

"Am writing letter. Please answer as soon as you read letter."

At the same time, Hole wrote as follows to Dunlap:

"Dear Sir:

"Replying to your telegram I will give you herewith a short synopsis of the proposition, for which I have been asked to find a manager.

"This plant is in the town of Radford, in the southeastern part of Virginia, consisting of a street railway three miles in length, a water plant furnishes the city fire protection and the citizens water for use in their homes, a small hydro electric plant located three miles from town, consisting of one 300 K. V. A. alternator which furnishes power, light and street lighting for the citizens and manufacturing industries in the municipality.

"The combined earnings at the present time of the three properties amounts to about $40,000.00 per year. They are operating on a little less than fifty per cent. basis. Have outstanding about $135,000.00 of bonds, which, after paying the interest on same, would leave practically $12,000.00 net balance.

"The man who has been in charge of this property has spent all the net balance and considerable money advanced by the owner in extensions and betterments of the plant.

"The water works system is practically new; the overhead lines of the street railway are in better condition than our lines here in Greensboro; you would, therefore, have very little work of a construction nature to do. You would be expected to conserve every penny you possibly could in order to make the payments upon the moneys advanced by the owners of the property. The position is one where you would of a necessity have to do considerable of the actual labor yourself, and where you would be busy all the time.

"The location of the town is ideal, the climate good, es-

pecially in the summer; the winters are somewhat more harsh than in Greensboro, owing to the fact that the town is situated in more or less a mountainous country. The town itself is very pretty, and has about 5,000 people; it extends three miles down the valley of the New river, has considerable manufacturing industries, and if the owners of this property could do so, it would be exceedingly wise to increase the size of the hydro electric plant, inasmuch as the power could be sold locally for a good figure.

"I would appreciate your writing me as to what terms would be agreeable to you, should you desire to make a change.

"I am making this proposition to you, largely because I have heard you say several times you would like to get into the operating end of a small plant.

"Write me as soon as you have reached a decision *together with the terms and salary* you would expect.

"Very truly yours,

"(Signed)   R. J. HOLE."

To this letter Dunlap replied by telegram:

"Resigned gas company to accept local position. Come there for twenty-five hundred per year on two-year contract. Immediate acceptance as position here must be accepted at once. Wire."

On April 15, 1918, Hole telegraphed his reply, as follows:

"Make your proposition twenty-one hundred per year. If services prove satisfactory an increase of four hundred at end of first year. Think you could handle job O. K., job has good possibilities. Please wire immediately as we want your services at once. Unable to write earlier as owner of proposition was out of town."

Dunlap accepted this proposition by telegram to Hole at Greensboro:

"Accept proposition as amended by you."

Thereupon Hole sent Dunlap the following telegram on April 17, 1918:

"Report Greensboro just as soon as possible; last of this week if you can.

"R. J. HOLE."

Dunlap promptly came to North Carolina and saw A. L. Brooks, one of the directors of the water company, who informed him without any preliminary conversation that his salary was to be $2,100 the first year and four hundred dollars additional for the second year, if his services proved satisfactory. Later Dunlap came to Virginia and saw Dr. J. J. Mott, the president of the company. Soon thereafter he went before a meeting of the board of directors of the Radford Water Power Company, on May 1, 1918. At this meeting Dr. Mott advised the directors that he and Mr. Brooks had employed the plaintiff as general manager of the company at the rate of $2,100 per year to be paid monthly. Dr. Mott suggested that a resolution be offered and passed to the above effect. This was done and the following resolution was proposed and adopted:

"Resolution—10 A. M.

"On motion duly made and carried the action of the president of the company and Mr. A. L. Brooks in engaging Mr. C. C. Dunlap as general manager of the company at a salary at the rate of $2,100 per year, be approved and the treasurer to make payment of the salary to the general manager in monthly payments at the said rate."

Dunlap entered upon his duties as manager on May 1, 1918, and continued uninterruptedly in the discharge of the same until June 2, 1919. Some time in March, 1919, Mr. H. C. Tyler, who had been elected president of the company after the death of Dr. Mott, saw Dunlap with respect to the discharge of an employee named Foster. This discharge Dunlap undertook to effect on June 2, 1919. A little later

Mr. Tyler, as president of the company, advised Dunlap that the company had employed one E. R. Wall as general manager, and that his (Dunlap's) services would be dispensed with. After some interviews with Mr. Tyler and the exchange of some letters, the relations between Dunlap and the company were finally sundered on September 1, 1919.

In November of that year Dunlap instituted legal proceedings against the water company to recover the balance due him upon his alleged contract for two years at the rate of $2,100 for the first year and $2,500 for the second year, in the event that his services for the first year were satisfactory. The Water Power Company appeared in the proceedings and pleaded not guilty. Thereupon a jury was sworn to try the issue, and later returned a verdict in favor of the plaintiff for the sum of $982.74, the same being the balance claimed by the said Dunlap.

The plaintiff in error (defendant below) assigns various errors, most of them being the action of the trial court in admitting evidence over the defendant's objection.

The defendant objected and excepted to the admission of the telegrams and letter between the plaintiff and R. J. Hole, the resolution of the board of directors and the testimony of C. C. Danlap; to the plaintiff's instructions given by the court, and to the action of the court refusing defendant's instructions, one to six inclusive, as the same appear in the record.

[1, 2] The foundation of the plaintiff's claim is an alleged contract of employment made with the defendant company for two years, beginning with May 1, 1918, at a salary of $2,100 for the first year and $2,500 for the second year, if the services for the first year were satisfactory. It was incumbent on the plaintiff to establish both the contract and its breach. To that end the testimony complained of was introduced, and in our view it was relevant and appropriate to the issues presented in the pleadings. If the presi-

84

dent of the Water Power Company was clothed with power to employ a manager for the company, and employed Hole as his agent to conduct negotiations and submit a proposition to Dunlap, then the acts of the agent were the acts of the president, and any memorandum, note or contract, signed by Hole was a memorandum, note or contract signed by the party to be charged thereby.

Section 5561 of the Code, 1919, reads in part as follows: "No action shall be brought in any of the following cases * * * 7th.   Upon any agreement that is not to be performed within a year, unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent * * *."

[3] Whether or not Hole was the agent of Dr. J. J. Mott and A. L. Brooks, whether these parties were respectively officers of the company, the one the president and the other a director; whether they were empowered to make a contract binding the company, and whether one or both of them did make such a contract, and what were the terms of that contract, if one was made, are chiefly inquiries of fact.   The law does not prescribe in detail how an issue of fact shall be established.   To that end all that is required is that the evidence submitted shall be competent and as a whole shall possess sufficient probative value.

Looking to the telegrams and correspondence, it is evident that Hole was not acting for himself but for another. Hole was not an officer of the company, apparently not interested in its operations, and does not appear in these proceedings save in said telegrams and correspondence. After the interchange of a telegram of inquiry from Hole, and a reply by Dunlap, Hole writes Dunlap a letter which begins as follows:

"C. C. Dunlap,

   "Galena, Ill.

"Dear Sir:

   "Replying to your telegram, I will give you herewith a short synopsis of the proposition for which I have been asked to find a manager."

The concluding statement of this sentence clearly advises Dunlap that the writer was acting for a principal so far undisclosed. Dunlap replied by telegram to the above letter, and thereupon Hole telegraphed an offer to Dunlap, and the latter by telegram accepted it. The reference in the telegram of Hole to Dunlap to "the owner of the proposition," is identified, and the name of the owner established by a statement in the testimony of H. C. Tyler, who, as stated, *supra*, succeeded Dr. Mott as president of the company on the latter's death. This statement is as follows:

"That he (H. C. Tyler) had been a director of the defendant company for several years; that Dr. Mott, the president, was practically the owner of the company's holdings, and his wishes were usually acceded to with reference to the management of the company's affairs."

Dunlap states in his testimony that in conformity with the telegram of April 17, 1918, he reported without delay to Greensboro, N. C. On arriving at that point he was at once taken to see Brooks, who seemed to be fully advised of what had passed between him and Hole, informed him that his salary would be as recited, *supra*, and told him to go to Radford and report to the board of directors, who would tell him when to go to work. Thereupon he reported forthwith at Radford and was taken by Hole to the residence of Dr. Mott. No conversation ensued between Dunlap and Mott as to his employment and terms of compensation. Apparently Mott needed no information on that line, since later, without being advised by Dunlap, he stated to the board of directors that he (Dr. Mott) and Mr. Brooks

had employed Dunlap as general manager of the company at a salary of $2,100 per year to be paid monthly. The directors were asked to pass a resolution to that effect. This was done by the introduction and passage of the resolution cited, *supra.*

It must be apparent, upon an inspection of the evidence recited, that Hole's principal was Dr. Mott, and that he was referred to in Hole's telegram to Dunlap as the "owner of the proposition," and described by President Tyler as practically the owner of the company's holdings. Hole was certainly not acting for himself, and he is sufficiently identified as the agent of Dr. Mott. The latter stated to the directors that he and Mr. Brooks had employed the plaintiff as general manager of the company. If he did not employ him through Hole, when and where did he employ him, as apparently he never talked with Dunlap on the subject, and never saw the latter until Hole brought him to his house?

[4] In our opinion the jury was justified in concluding from the evidence that Hole acted as agent for Mott in his dealings with Dunlap, and that Mott referred to the contract made by Hole with the former when he informed the directors that he and Brooks had employed Dunlap as general manager of the company. *Qui facit per alium facit per se.*

[5, 6] But if Hole was acting as agent for Mott, then the contract made by the telegrams was a contract in writing signed by the party to be charged thereby. It is objected by the plaintiff in error that the telegram of Dunlap, accepting the modified or amended proposition submitted by Hole, was not produced. When Dunlap signed this telegram and delivered it to the telegraph company, the original passed out of his hands. It appears from the testimony of the plaintiff that he took a copy of this original at the time it was delivered, but has since been unable to locate it; fur-

ther, that he made an unsuccessful effort to procure a copy of this telegram from the telegraph company and the defendant company. Upon this state of facts it was competent for the plaintiff to prove the contents of the reply telegram, the same being as effectual for probative purposes under such circumstances as the original.

[7] Our conclusion that the telegrams and correspondence between Hole and Dunlap established a definite contract of employment on agreed terms by which Dunlap was retained as general manager of the Radford Water Power Company, in no wise conflicts with the principles announced in *Rahm* v. *Klerner,* 99 Va. 10, 13, 37 S. E. 292. While Hole nowhere describes himself as the agent of Mott, he very clearly indicates that he is not acting for himself. When it is possible to ascertain the essential terms of a contract from the writings of the parties, parol evidence is admissible to apply the contract to the parties, and show the agency of one of the parties signing the contract, memorandum, or note. *Lang* v. *Henry,* 54 N. H. 57, 60.

[8, 9] The plaintiff in error assigns as further error the admission of the resolution of the directors, cited *supra.*

It is not considered that this objection is well taken. If the president of the company had made a valid contract of employment on behalf of the company, ratification of that contract may have been unnecessary, but it was not illegal, or improper. It was certainly competent for the plaintiff to show from the minutes of the directors what was actually done in that connection. It was not necessary for this ratification to refer in terms to any negotiations by telegram, letter or otherwise between Mott, or his agent, and Dunlap. The contract represented the result of these negotiations, and could be ratified by a single resolution to that effect. A far more important and interesting question is the effect of this resolution upon the status of the parties. Plaintiff in error contends that by its terms it ratifies merely a con-

tract of hiring for $2,100 a year, and is inconsistent with plaintiff's claim of a definite contract for two years with a provision for an increase of salary the second year in the event plaintiff's services were satisfactory. Further, that Dunlap heard Dr. Mott's statement to the directors, "that he had employed him as general manager at a salary at the rate of $2,100 a year," and "the resolution read," and made no protest at the time, either as to the wording of the president's statement, or to the resolution, thereby estopping himself from his present contention that his contract was for two years with a provision for a possible increase. This contention deserves serious consideration. Dunlap admits that he heard Mott's statement, and the terms of the resolution, and that he made no protest. But he explains this by saying that he paid no particular attention to the resolution, and did not observe that there was any conflict between the resolution and his contract; that he relied upon the latter which was a contract for two years' employment; and "that he would not have come from Illinois on a shorter term."

It is perfectly true that the letter and telegrams show that Dunlap insisted upon a two-year contract, and that the contract actually appearing from this letter and telegrams was for a two-year term with provision for an increase. Further, as soon as Dunlap arrived in Greensboro, he was advised by Brooks that his salary was to be $2,100 for the first year, and $400 additional for the second year, if his services proved satisfactory. At no time was any suggestion made that the contract to the above effect should be modified. Having insisted upon this contract from the beginning, having made this contract through Hole, having given up his prospects in a distant State, and come east upon an agreement providing definitely for a two-years' term, with a provision for an increase, having been informed as soon as he reached North Carolina by one of the

officials of the company that his terms had been agreed to, and having been directed to go to Radford and report to the directors for assignment to duty, it is in the highest degree unlikely that if he had regarded the resolution as a modification or diminution of his contract, he would have accepted it without protest. Hence the fact that Dunlap did not protest confirms his statement that he was not particularly attending to the resolution, and did not regard it as being in conflict with his contract. But waiving any conclusion to be drawn from Dunlap's silence, did the resolution approve only a contract with Dunlap for service at the rate of $2,100 a year, and if it did, the next inquiry is whether this limited ratification avoided the contract which had been made with Dunlap for two years service with provision for an increase?

[10] It must be concluded that the directors ratified only what was submitted to them. It does not appear that President Mott made any further statement to the directors than that he and Brooks had employed Dunlap as general manager at the rate of $2,100 a year, to be paid monthly. He asked that this contract of employment be ratified, which was accordingly done. This action ratifying the contract submitted by Dr. Mott cannot be extended to include ratification of features and terms of the contract which had been actually agreed upon, but which do not appear to have been revealed to the directors. The terms of the resolution fix the limits of the ratification. But the limited ratification of the directors did not affect the rights of the plaintiff under the contract originally made, if that was a valid contract not requiring ratification, unless such ratification was acquiesced in by the plaintiff as a change of contract. There is nothing in the evidence to show that the directors intended to do more than they did, namely to ratify what was submitted to them in terms. We have no idea that Dr. Mott intended to change the contract, or was doing more than

referring to same in terms of brief description, without undertaking to go into complete details, but we are bound by the record in this respect.   There is no reason whatever to conclude from the evidence, as stated *supra,* that Dunlap considered the action of the directors as a change of his contract, or as an effort to change it.   This phase of the case has been discussed heretofore.   The plaintiff states in this connection that he had a contract for two years' employment, on which he relied, and would not have come from Illinois on a shorter term.   This was his contract with Dr. Mott. Was that a valid contract, not requiring ratification by the directors?

In *R. F. & P. R. Co.* v. *Snead & Smith,* 19 Gratt. (60 Va.) 354, 100 Am. Dec. 670, it appears that one Robinson was the president of the railroad company, and as such contracted for certain work to be done on the property of the company.   He gave a note of ambiguous character for the amount due for this work, and parol evidence was admitted with respect to the consideration, the origin of the paper and its real meaning.   The company was required to discharge the note as a liability of its own.   The court said: "The authority of Robinson as president of the railroad company to make contracts for necessary labor for the company was incident to his office and has not been disputed. Such incidental powers exist by law and general usage, and exist in all cases where the authority of the president is not restricted by special legislation, or regulations of the company known to the other contracting party."   19 Gratt. (60 Va.) p. 364, 100 Am. Dec. 670.   The verdict in the present case can be supported upon the facts herein appearing, without going to the full extent of the authority last cited.

If the conclusions as to the incidental authority of the president in the case, *supra,* are supported by reason, by how much the more can like conclusions be drawn with respect to the authority of the president in the case in judg-

ment.  If, as contended by the plaintiff in error, the president's power as an agent is to be sought in a delegation of authority from the corporation directly, or through its board of directors, formally expressed, or *implied from a habit or custom of doing business,* could not that deduction be fairly made in this case in respect of a president of whom it is said in the testimony, that "he was practically the owner of the company's holdings, and that his wishes were usually acceded to with reference to the management of the company's affairs."

As said in 1 Morawetz on Private Corporations (2d ed.), sec. 538: "There can be no doubt that the board of directors may invest the president with authority to act as chief executive officer of the company.  This may be done either by an express resolution, or by acquiescence in a course of dealing.  A person dealing with the president of a corporation in the usual manner, and within the powers which the president has been accustomed to exercise, without the dissent of the directors, would be entitled to assume that the president had been actually invested with those powers."

The contract with Dunlap was not a contract with respect to the disposition of the company's property, or to change its policies, or to increase its liabilities for new equipment. It was a contract for the employment of labor for the necessary conduct of its established business.  The authority to make such contracts for the reasonable execution of the company's business is as clearly incidental to the president's office as the authority in the case, *supra,* to employ laborers to do work on the property of the railway company, and to charge the company therewith.  That case declares that the incidental authority which it upheld exists in all cases where the authority of the president is not restricted by special legislation, or by regulations of the company known to the other contracting party.  In the case in judgment, the authority of the president is not restricted by special legislation, or by regulations of the company known to Dunlap.

85

[12] Nothing that we have said, or hold, in this case, is. in conflict with or designed to be in conflict with the wholesome principle, that persons dealing with corporations must take notice of what is contained in the law of their organization, and that they must be presumed to be informed as to the restrictions annexed by a grant of power by the law by which the corporation is authorized to act.

If there was anything in the general laws of the State, or the law of the defendant company's organization, which restricted or took away the incidental powers of the president, referred to *supra*, Dunlap would be presumed to be informed as to the same. In that respect he would contract with President Mott at his peril. But it does not appear that there was any limitation upon the powers of the president, save the statement of Mr. Tyler that the by-laws of the company authorize none other than the board of directors to employ a general manager. This by-law is not put in evidence, but even if it could be considered as established in the proper formal manner by the mere statement of the witness, it is a regulation of the company unknown to the other contracting party.

It is considered, therefore, that it was within the authority of the president to make with Dunlap the contract of employment under consideration.

The plaintiff in error excepted to all of the instructions given for the plaintiff, and also to the action of the court in refusing certain instructions framed by the defendant.

The instructions given very fairly and adequately submitted the case on the merits to the jury.. On all of these issues the jury found for the plaintiff. It would not be profitable in view of what has already been said, to take up seriatim the instructions offered by the defendant and refused by the court. These instructions were properly refused. Some of them embodied erroneous propositions of law, or propositions that, if correct, were stated in a mis-

leading manner, or were not appropriate to the facts; others were unnecessary because the jury were sufficiently instructed on the questions in issue by the instructions actually given.    Even conceding that there was some element of abstract error in the action of the court with respect to the instructions given or refused, it was harmless error.

The verdict, in our judgment, is fully supported by the evidence and the judgment of the Corporation Court of the city of Radford is affirmed.

*Affirmed.*