# Wytheville

THE TITLE INSURANCE COMPANY OF RICHMOND, IN-
CORPORATED, v. CLARA A. HOWELL, EXECUTRIX.

June 16, 1932.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*R. E. Cabell* and *J. Gordon Bohannan*, for the plaintiff in error.

*Page & Leary*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is a fifteen day motion brought by Mr. Arden Howell, now dead, to recover of the Title Insurance Company of Richmond, the sum of $1,062.51, claimed to be due under a contract of employment. He has recovered a judgment for the full amount.

Designating the parties as they stood in the trial court the plaintiff, a lawyer in Richmond of standing and experi-

ence, was an expert title examiner. The defendant believed that his services would be valuable to it and set about to secure them. Mr. E. D. Schumacher, who was then its president and chief executive officer, opened negotiations for the purpose. They terminated in the contract sued on. Howell was made vice-president, placed in charge of the Title Insurance Department, began work on July 1, 1930, and continued there until September 15, 1930, when he was discharged by letter from Mr. Wilson, of date August 30th, and received early in September, notifying him that his services would not be needed after the 15th. Mr. Wilson, who was the successor of Mr. Schumacher, took office as president some time in August.

Compensation to the plaintiff was a major consideration and he had suggested a salary of $8,500.00 a year. That suggestion was unacceptable but satisfactory terms were finally agreed upon, are in writing and appear in this resolution adopted at a meeting of the executive committee, held on May 12 or 13, 1930:

"On motion duly made and seconded, the executive committee accepted the recommendation of the president and recommended that the board of directors authorize the employment of Mr. Arden Howell and his election to the office of vice-president and counsel to devote his efforts in the interest of the company and to suggest such improvements and methods of upkeep as will make the abstract plant more efficient and economical in operation. The salary of Mr. Howell to be at the rate of $708.34 per month, payable on the 1st and 15th of each month, Mr. Howell assuming his duties on July 1, 1930, and his salary and office becoming effective from that date."

When this was shown to Mr. Howell, he protested and said: "My proposition was $8,500.00 per year." Mr. Schumacher answered: "Well, it is the custom of the company to employ officers by the month," and that "it

was the custom of their company when employing the officers to employ them on the basis of one month, but that they were entitled to one month's notice in the event their services were not longer needed."

Afterwards both Howell and Schumacher initialed a copy of this resolution. It was confirmed at a meeting of the board of directors held on the 15th, and under it he went to work.

It is well to bear in mind plaintiff's exact claim, for the temptation to digress and to grow didactic is at times exceedingly strong.

His counsel, in their brief, say: "It was the claim and contention of the plaintiff that he was employed by the defendant at a monthly salary of $708.34, payable on the 1st and 15th days of each month, *upon the express understanding and agreement that he should be given thirty days' notice in the event of the termination of his employment.*"

And again: "Its president and chief executive officer, who represented the defendant in all of its negotiations and dealings with the plaintiff leading up to and culminating in his employment, expressly agreed that the employment of said Howell was to be upon a monthly basis as contradistinguished from a yearly basis, at a salary of $708.34 per month, payable on the 1st and 15th of each month, *and that said Howell would be entitled to thirty days' notice in the event his employment should be at any time terminated by the defendant;* and that said Howell entered the employment of the defendant on this express understanding and agreement and upon no other terms."

It is perfectly plain that the express agreement here relied upon is that made with the president. Certainly no such agreement appears in the contract as written. It is there stipulated that he was to be paid, not $708.34 a month, but "at the rate of $708.34 per month" so it is not a contract for hire from month to month but merely a general contract

of hiring, to be paid for on a stated basis while nothing at all is said about notice. Seven hundred eight dollars and thirty four cents a month is $8,500.00 a year. Had the resolution provided that he should be paid at the rate of $8,500.00 a year could it be said that he was employed by the year and was entitled to a year's notice or that such a construction did not vary, alter, or contradict its terms? We think not.

■ The general rule that parol evidence is not competent to vary the legal effect of a written contract is settled law, not challenged and does not here merit discussion. *Towner* v. *Lucas' Ex'r*, 13 Gratt. (54 Va.) 705; *Slaughter* v. *Smither*, 97 Va. 202, 33 S. E. 544. Ambiguities may be cleared away and weasel words explained, but that which is plain needs no explanation.

■ "In the United States the prevailing doctrine is that every such general hiring is terminable at the will of the parties. Lile's Notes on 1 Min. Inst., page 54; 20 A. & E. Enc., 2d ed., page 14; 26 Cyc. 874." *Conrad* v. *Ellison-Harvey Co.*, 120 Va. 458, 91 S. E. 763, 766, Ann. Cas. 1918 B, 1171.

"A contract of employment for an indefinite term may, in the United States, be terminated at the will of either party." 39 Corpus Juris, page 71.

■ No claim is made that the company itself did anything to take this case out of the ordinary rule or that suggested the possibility of such a construction. Parol evidence is never competent to show merely what one of the parties to a contract thought.

■ We need not concern ourselves with general law as to the power of presidents. Mr. Schumacher, during the course of preliminary negotiations, explained to Mr. Howell that he had no authority to make this contract with him and that whatever was done would have to be done by or with the approval of the board of directors. He was put on notice. With this information before him, he, an ac-

complished lawyer, knew that a president who had no power to make a contract had no power to change it, and that his interpretation of its legal effect had no more force than if made by a stranger, and could place no new burden on this company. He could not make an express contract and he could not make any binding explanation of that in judgment for he was not a party to it. Moreover, he knew that a by-law, which he probably wrote, gave to the president, at his election, power to discharge any officer with or without notice.

Something is said about custom but "extraneous evidence of a custom which alters or varies the terms of such a contract is upon familiar principles inadmissible." *Sutherland & Co.* v. *Gibson*, 117 Va. 844, 86 S. E. 108, 109; *North Shore Imp. Co.* v. *New York, P. & N. R. Co.*, 130 Va. 464, 108 S. E. 11. As a matter of fact, in this case none has been shown. Mr. Schumacher's statements to Mr. Howell are not evidence. The company's secretary has said that employees are usually given fifteen days' notice, but that there was no rule as to officers, only one of whom had ever been discharged. One swallow does not make a summer.

Salary from August 15th to September 15th, $708.34, is concededly due, but none is due for the latter half of September, Such evidence as has been introduced to sustain that claim is both insufficient and incompetent.

The defendant has set up a counter-claim for $1,000.00, which Mr. Howell received from it in addition to his salary. He contends that it was in compensation for special services, while the company claims that it was merely a loan or advance. A jury has found for the plaintiff.

In the spring of 1930 consolidation of plaintiff company with Lawyers' Title Insurance Company was under consideration. Mr. Schumacher favored it and authorized Mr. Howell to secure, if possible, options on stock of the latter

company in amount sufficient to control that corporation, and this he, in conjunction with Mr. J. P. Sloan, undertook to do. They did secure options on 1,731 shares. This did not carry control. There was a meeting of the executive committee on May 12 or 13, 1930. The matter was referred to it. That committee was unwilling to purchase anything less than the majority of the stock, and so was unwilling to exercise options already secured, but was willing to go forward if it could purchase a controlling interest or 2,525 shares at a certain price and so notified Mr. Howell by letter of date May 12th.

He, on his part, by letter of date May 13th, wrote to the company that neither he nor Mr. Sloan made "any claim or demand for our services in the matter." This letter, however, did not purport to deal with subsequent services; at any rate, it is susceptible to that construction.

Options taken were about to expire. Howell was given sixty days in which to secure a renewal of them and such others as were necessary. He failed in this and on July 15th, by letter, so notified the company. He did secure renewals and new contracts covering 1,750 shares but that did not carry control and so nothing was done. Efforts to effect a consolidation were then abandoned.

There is conflict of evidence as to what occurred at the meeting of the executive committee on May 13th. For the company it is said that it was distinctly undertsood that it was to be put to no expense by reason of Mr. Howell's new undertaking. He was present during its closing moments—there by invitation. Mr. Schumacher, president, was also there.

Mr. Howell testified in part as follows: "Mr. Schumacher said that the committee was unwilling to take up the 1,735 shares of stock, but they were willing to employ my services to go ahead and get the options of 2,525 shares; it took 2,501 shares to get a control. I told them I doubted very

seriously if a control could be gotten, but that I would give my best efforts to it, then there was some discussion about it, and Mr. Wilson jumped up out of his chair and said: 'Well, I am willing for Mr. Howell to go ahead with this, but I am not willing to pay any commissions.' Mr. Schumacher then said: 'Well, Mr. Wilson, if Mr. Howell goes ahead and gives his time to it, there will necessarily be some expense incurred in connection with the matter.' I cannot quote his words exactly, but Mr. Wilson said that as far as he was concerned he would be willing to compensate me for my services in the matter but was not willing to pay any commission. A commission of $3.00 a share would have amounted to over $5,000.00, but he was willing to compensate me for my services."

Mr. Schumacher said: "I understood, definitely understood, that the president would have authority to go ahead and allow Mr. Howell a reasonable expense, according to his judgment, which he had exercised previously."

If we put aside what Mr. Schumacher understood there is still left Mr. Howell's statement to the effect that while the committee was still in session a member of it said to him that they were willing to employ his services to secure new options and that another member of the committee, Mr. Wilson, said that "he was willing to compensate me for my services."

This statement made by Mr. Howell, if credited, is sufficient to sustain a verdict. It is true that there is nothing in the record of this meeting to support it, but this he could not know. He may have thought that it would be written into it, but whether that be true or not he had the right to rely upon it. Those who now question it should then have spoken. We do not lose sight of the fact that there is evidence denying all of this, but since there is a verdict it is only necessary for us to see if it is sufficiently sustained.

On that day the company sent to Mr. Howell a

check for $500.00. It appears on its record as "Advances on loan." On June 4th, he was sent another check for $500.00 which was charged to the account of "Advance." Mr. Schumacher said that these two payments were authorized by him and were paid on account of services rendered in an attempt to secure new options. He further said that while Mr. Howell was engaged in this work he was in constant conference with him. They were voluntarily made and made under no mistake and must stand. The new president is as much bound by them as his predecessor would be if he were still in office. *Mayor, etc., of Richmond* v. *Judah*, 5 Leigh (32 Va.) 305; *Barrow* v. *Prince Edward County*, 121 Va. 1, 92 S. E. 910; *Commonwealth Brokerage Co.* v. *Oil Fields Corp.*, 174 Ark. 746, 296 S. W. 714; *Pardue* v. *Absher*, 174 N. C. 676, 679, 94 S. E. 414; 48 Corpus Juris, page 736, sections 280-1-2.

Objection is taken to plaintiff's instruction 1. It deals with his right to recover salary for the latter half of September. Since we have held that he had no such right, it ceases to be important.

Exception is also taken to plaintiff's instruction 2, which reads:

"The court instructs the jury that if they believe from the evidence that in May, 1930, the plaintiff was authorized by the defendant to endeavor to obtain options on 2,525 shares of the stock of the Lawyers' Title Insurance Company for the benefit of the defendant, and agreed to pay the plaintiff a reasonable compensation for the service so to be performed, and that the plaintiff accepted and entered upon his employment upon such understanding and agreement, then the jury is instructed that the plaintiff is entitled to such sum as the jury may believe from the evidence will reasonably compensate the plaintiff for the service performed by him, not to exceed $1,000.00, and the jury is further instructed that the defendant is entitled to recover on its offset only

the difference between the sum of $1,000.00 which has been heretofore paid to the plaintiff for such services, and such sum, if any, which the jury may believe the plaintiff is entitled to be paid for such service."

It is said that there is no competent evidence to show such an agreement. Howell has testified that Mr. Schumacher, when the executive committee was still in session, told him in its presence that the committee was willing to employ him to secure these options. Promise to pay for work done followed as a matter of course. It is said that the president had no power to make such a promise. Granted. The committee had, and is bound by the statement of the president, made in its presence without contradiction, just as it would have been bound by the uncontradicted statement of any other member made in like circumstances. *Mumford Banking Co.* v. *Farmers & Merchants Bank*, 116 Va. 449, 82 S. E. 112. They, in effect, represented him as having authority to speak.

It is true that there is no direct evidence as to the value of his services, but there is testimony tending to show that he worked steadily and was in constant conference with the president about this project. The defendant itself by payments made, has said what this work was worth and that is enough.

Error is also assigned because a number of instructions tendered on behalf of the defendant were rejected. That numbered 1, in so far as it dealt with the right to disputed salary, has become unimportant. The latter part of it deals with the defendant's set-off and might, as might instruction 5 covering the same subject, have been given. But that phase of this case was adequately elsewhere covered.

Instruction 2 told the jury that the president has no power to contract not expressly conferred by charter or by-laws or by some resolution of its board of directors or its executive committee.

██ Contracts which a corporation may make and which are made by its president with the knowledge and acquiescence of its board of directors are binding, even though the president, as an original proposition, might not have been clothed with necessary power. Morawetz Private Corp. (2d. ed.) section 538; *Radford Water Power Co.* v. *Dunlap,* 128 Va. 658, 105 S. E. 257. One who permits another to hold himself out as agent and appears to acquiesce in that assumption of authority is bound thereby.

Instruction 3 told the jury the plaintiff could not recover on any agreement not expressly authorized by the committee. He could recover under authority given by implication, as we have already seen.

Instruction 4 again takes up claims for salary. Since we have sustained the defendant in that instance, its consideration would be useless.

While we have not undertaken to follow the assignments of error in the order of their statement, we have dealt with all matters which appear to be of controlling importance, and have reached the conclusion that plaintiff's judgment should be credited by $354.17 as of September 15th.

██ We have also reached the conclusion that the executive committee had full authority to employ Howell to secure for it, if possible, options on 2,525 shares of stock in Lawyers' Title Insurance Company, and that, having such authority, it was bound by the statement of one of its members, made to him in its presence and without protest, to the effect that this committee was willing to employ him. The jury must have believed that such a statement was made and has said so by its verdict.

There are no reversible errors in instructions given and so, for reasons stated, the judgment of the trial court, modified to the extent noted, is affirmed.

*Modified and affirmed.*