# Staunton

## C. C. KING v. COMMERCIAL FINANCE COMPANY.

September 20, 1934.

Present, All the Justices.

The opinion states the case.

*Williams & Farrier,* for the plaintiff in error.

*J. S. Andrews* and *Chaney & Loyd,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

In a fifteen day motion plaintiff seeks to recover on this negotiable note:

"$1,000

Roanoke, Va., July 9, 1929.

"On or before November 1, 1929, for value received I promise to pay to Commercial Finance Company, Inc., or order without offset, negotiable and payable at its office at Roanoke, Va.,

"One Thousand & no/ ....................... Dollars with six per cent interest from April 7, 1928.

"Homestead and all other exemptions waived by maker and each endorser. If this note is not paid at maturity, and is collected by suit or attorney, the maker and endorsers hereof agree to pay, in addition to the amount of this note, all costs incurred thereon and attorney's collection fees. The maker and endorsers hereby waive presentment, demand of payment, protest and notice thereof, of this note.

"This note is one deferred payments on ten shares of stock of said company

"No. ............ Due ............

"C. C. KING,
"Pearisburg, Va."

This is not the original obligation but a renewal. With the original went a contract of subscription which tells us for what and how it came to be executed. That contract reads:

"COMMERCIAL FINANCE COMPANY, INC.

of

"ROANOKE, VIRGINIA

"This is subject to
   acceptance by C. C.
   King until Jan. 1, 1928.

    No. Shares ........................    10
    Cash Payment ......................$.......
         Note
    First deferred payment ...............$1,000.00
    Second deferred payment..............$.......
    Third deferred payment ..............$.......

"STOCK SUBSCRIPTION

*"To the Commercial Finance Company, Incorporated, of
    Roanoke, Virginia:*

"I do hereby subscribe to 10 shares of the Capital Stock
of the Commercial Finance Company, Incorporated, of the
par value of one hundred ($100.00) dollars per share, and
agree to pay therefor the sum of $1,000.00, of which amount
I have this day paid by check drawn to the order of the
Commercial Finance Company, Incorporated, the sum of
$1,000.00, By note .................................,
with six per cent interest on each deferred payment from
................, 192.., until paid and for which said
deferred payments I have made and delivered my interest
bearing notes waiving the homestead exemption. The cer-
tificate of said stock covered by this subscription is to be
delivered to me upon payment of all of said notes.

"No moneys, fees or commissions over 10 per cent are
proposed to be paid by this Company for the promotion and
sale of its stock.

"I recognize that agents or solicitors have authority to
receive payment only by check, payable to the order of
Commercial Finance Company, Incorporated, and that said

agent or solicitors have no authority to in any way change or modify the printed form of this contract, and no inducement of profit, gain or advantage unusual in the ordinary course of legitimate business has been advertised or promised me to secure this subscription.

"Given under my hand and seal, this 12th day of Dec., 1928.

"C. C. KING (Seal)."

Mr. King filed this statement of his defense:

"The said defendant, for grounds of defense, will rely upon every defense available to him under his plea of *nil debet,* and especially on the ground that he was induced to subscribe for stock in the plaintiff company and to execute his note therefor, through the fraud and misrepresentation of plaintiff, in this, that the said plaintiff represented to defendant and promised him that he would never be called upon to pay any money on said note; that said company expected to loan money in Giles county and that defendant, and no one else, should handle said loans for the company and receive certain brokerage commissions for his service, and that the plaintiff would carry said note and that defendant would be allowed to pay the same with his said earnings and the dividends which would be paid on said stock; that the defendant, from time to time, notified the plaintiff that he had applications for loans in Giles county, and that the said plaintiff absolutely failed to allow defendant to place any loans for it, and failed to pay any dividends on said stock.

"And further, that as an inducement to defendant to subscribe for said stock and execute his note therefor, it was represented to this defendant by the agent of the plaintiff, who procured his said subscription and note, that since the said corporation was organized its stock had greatly increased in value and that the company was doing a successful business, when as a matter of fact it was not then successful and never has been, and is now insolvent and defunct.

"And also, that there is no valid and legal consideration for the said note.

"And also, that there is no such corporation empowered to sue."

Upon motion of the plaintiff the court struck out "certain parts of said grounds of defense." Just what they were the order does not show.

After the evidence was in, the court, on plaintiff's motion, struck out all of the defendant's evidence except that which related to a credit of $60. There was a verdict for the plaintiff which the court confirmed.

No attempt was made to show that Mr. King had been prevented from making loans for the defendant company in Giles county or that it had no power to sue.

It is contended that there was fraud and misrepresentation in that the agent or agents of the company who sold him this stock told him that he would never be called upon to pay the note, but that it would be paid through dividends of the company whose business was growing and successful. In short they painted prospects in glowing colors.

These agents were agents with limited powers. They could sell stock but they could not vary the written terms under which it was sold.

"The general principle that evidence of a contemporaneous parol agreement is not admissible to vary or contradict the terms of a valid written instrument, except in cases of fraud or mistake, is so familiar and well established that citation of authority in its support would seem to be superfluous. It is a principle founded in wisdom, and cannot be too carefully guarded. Upon its enforcement the certainty and sanctity of written contracts depend, and its violation would be destructive of the most solemn transactions of life. This court has so often, in elaborate opinions, discussed this subject, and adhered without variation to the rule of evidence adverted to, as an established axiom of our jurisprudence that nothing further can be added without useless repetition. See *Towner* v. *Lucas' Ex'r*, 13 Gratt. (54 Va.) 705; *Woodward, Baldwin & Co.* v. *Foster*, 18 Gratt.

(59 Va.) 200; *Martin's Ex'x* v. *Lewis' Ex'r,* 30 Gratt. (71 Va.) 672 (32 Am. Rep. 682); *Citizens' Nat. Bank* v. *Walton,* 96 Va. 435, 31 S. E. 890." *Slaughter* v. *Smither,* 97 Va. 202, 33 S. E. 544; *Jones* v. *Franklin,* 160 Va. 266, 168 S. E. 753.

■ "The general rule that parol evidence is not competent to vary the legal effect of a written contract is settled law, not challenged and does not here merit discussion. *Towner* v. *Lucas' Ex'r,* 13 Gratt. (54 Va.) 705; *Slaughter* v. *Smither,* 97 Va. 202, 33 S. E. 544. Ambiguities may be cleared away and weasel words explained, but that which is plain needs no explanation." *Title Ins. Co.* v. *Howell,* 158 Va. 713, 164 S. E. 387, 389; Fletcher on Corporations, vol. 2, section 609.

■ Where the contract in writing is incomplete upon its face, parol testimony may supply the deficiencies and contemporaneous collateral agreements may be shown where they are not inconsistent with terms definite and written. *Trout* v. *Norfolk & W. R. R. Co.,* 107 Va. 576, 59 S. E. 394, 17 L. R. A. (N. S.) 702; *Farmers' Mfg. Co.* v. *Woodworth,* 109 Va. 596, 64 S. E. 986; 22 C. J. sections 1247, 1250.

■ Special contracts for sales of stock do not bind the corporation until those terms are brought home to it and ratified. *O'Dell* v. *Appalachian Hotel Corp.,* 153 Va. 283, 149 S. E. 487, 490, 68 A. L. R. 629. That case is important in that there, as here, the contract of subscription limited the agent's authority. It held:

"The contract provides that no statement, representation or agreement, other than those recited in the agreement contract, shall be binding on the parties. It follows that the agreement, as claimed by the defendant, not being stated in the contract, the same is not binding upon the subscribers and cannot be invoked to prevent the payment of the defendant's subscription." See, also, 22 C. J. p. 1253.

■ One must be guileless indeed who gives his note and relies upon the promise that he will not have to pay it nor can he rely upon the promise that it is to be paid by

dividends. *Lancaster* v. *Southern Life Ins. Co.*, 89 S. C. 179, 71 S. E. 864; note Cook on Corp. (7th Ed.) vol. 1, p. 471; *Long* v. *Mayo*, 156 Va. 185, 157 S. E. 767. In this last named case evidence of an agreement that stock might be paid for in dividends was received, but that evidence rested upon a contemporaneous written agreement. The sale was not by the company but by one of its stockholders of his individual holdings. Any agreement which he made as to the manner of payment of course bound him.

At common law stock to the extent of its par value had to be paid for in money or its equivalent. *Martin* v. *South Salem Land Co.*, 94 Va. 28, 26 S. E. 591; *Monk* v. *Barnett*, 113 Va. 635, 75 S. E. 185. Now, with the consent of the corporation it may, upon proper report to the State Corporation Commission, be paid for in many ways. Code, section 3788, as amended by Acts 1926, ch. 553.

Fraud in the procurement of a contract of subscription is a complete defense, but representations relied upon must refer to past or existing material facts. Collateral promises or statements as to matters which may occur in the future are not sufficient. *O'Dell* v. *Appalachian Hotel Corp., supra; Stevens* v. *Clintwood Drug Co.*, 155 Va. 353, 154 S. E. 515; Fletcher on Corporations, section 619. Nor can "booster" statements of enthusiastic agents be depended upon. *Akers, etc.* v. *Radford State Bank, Inc.*, 153 Va. 1, 149 S. E. 528. They are to be expected.

Mr. King tells us what the representations he relied upon were:

"They represented the stock to be so and so, which has since proven to be very much misrepresented. They led me to believe that the company was doing a business in Roanoke successfully, and they were going right along, and that the stock would increase from fifteen per cent to twenty-five per cent. I kept telling them I didn't want it, never did want it, and I don't want it now, but they finally induced me to take the stock, they said I never would have to put any money out on it, that the dividends would be credited on this note and things of that kind."

They told him that the stock had increased in value since the company had been organized. In all the tide of time we do not suppose that an instance can be found in which the agent said to a possible purchaser that business was bad and that the prospects of his company were poor. Mr. King is a grown man, fifty years old in fact, and has been many years in the insurance business. The simple fact is that he permitted himself to be overpersuaded, and while the agents from whom he bought may not be free from blame he is in the main responsible for the condition in which he now finds himself.

So much for the original note. What are the conditions under which it was renewed? He tells us.

"Now I found out later that that was not what they represented to me. They came back to me with several letters and I have several of them. I have one which represented that the dividends had been declared on the stock and that it was very much to my interest to renew the note, at the next meeting the dividends were to run from twelve per cent to forty per cent. I can't find the letter but I have several letters stating that that investment would yield fifty per cent. I didn't want to renew the note, finally I didn't renew the note from that letter but I did later when Mr. Miley came to my office and said 'we are reorganizing and are going to be right on the point where the company is going to be more successful than it has ever been. It is to your interest to give us a new note and we will carry it just as long as you want us to. The dividends will be credited on the note.' That is why I gave a note like that. I afterwards found out that the company is not worth anything. I refuse to pay for something I have not gotten the benefit of."

When Mr. King came to renew this note he had that information in his possession which he now relies upon. He tells us that he had found out that matters were "not what they were represented to me." And yet, because of a promise of extraordinary dividends, he was induced to stay with the company. The agent, Mr. Miley, said to him, "We

are reorganizing and are going to be right on the point where the company is going to be more successful than it has ever been. It is to your interest to give us a new note and we will carry it just as long as you want us to. The dividends will be credited on the note." On this plea the renewal was given. This is the language of its maker: "That is why I gave a note like that."

In the face of all that he knew he was still willing to take a chance. Having taken it he must abide by it.

■ Repudiation on the ground of fraud must be prompt. Where one with knowledge elects to stay with the company he will not be heard afterward to complain. *Akers et al.* v. *Radford State Bank, supra.* It is true that this principle is applied more rigorously where the rights of creditors are involved but as against the company ordinary principles of election and estoppel apply.

Manifestly there is confusion as to dates. The contract of stock subscription bears date December 12, 1928. On it is this endorsement: "This is subject to acceptance by C. C. King until January 1, 1928." The probabilities are that Mr. King was given until January 1, 1929, to determine what he would do. Mr. Miley who took the subscription was called as a witness by Mr. King. This is his explanation as to how this confusion in dates came about:

"Q. Mr. Miley, this note which is presented here and the note sued on is for $1,000 dated July 9, 1929, payable November 1, 1929, with interest from April 7, 1928. Do you know whether or not April 7, 1928, was the date of the original transaction?

"A. I don't think so. It should be dated the same as the subscription blank.

"Q. The subscription blank seems to be dated December 12, 1928.

"A. The interest on this note should be from that date.

"Q. Yet you take a note in 1929, bearing interest from April 7, 1928, when you say the original transaction was December, 1928?

"A. The reason for that is, Mr. Farrier, that prior to the actual starting of business, we had a number of notes, the interest was to start on those notes from the date the company commenced business and the 7th of April was the date, and in renewing this, I evidently made an error in the time and it should be December 12, instead of April 7.

"Q. And you think that Mr. King did not subscribe for the stock until December 12?

"A. He didn't subscribe until this time. That subscription blank has never been changed so far as I know and it was given to me shortly after, at the time this note was renewed the note that was executed was returned to Mr. King.

"Q. You were secretary and treasurer of the company, what was the actual value of that stock at the time the subscription was sold to Mr. King?

"A. I regard it as par value."

It is the only explanation which we have; it was tendered by the defendant and is accepted.

The defendant has asked for a new trial on the grounds of after-discovered evidence. That is the original note and bears date December 12, 1927. It was in the possession of defendant but he claims that he had been unable to find it though he had searched diligently and the contention is now made that if this note was given in 1927, it was given before the company commenced business and that a statement to the effect that it was then doing a successful business was a material misrepresentation of an existing fact.

It is not likely that a jury would, upon a new trial, find that this transaction actually took place in 1927. The contract of subscription which accompanied the note shows that it did not. Miley, the agent who took it, has testified that it did not, and Miley is a witness for the defendant. If the original note was given on December 12, 1927, though due in six months, it was not renewed until July 9, 1929. In short, we do not think that a jury upon a new trial would

reach the conclusion that the original transaction took place in December, 1927. But if it did, the results would be the same. Any misrepresentations made to the maker were known to him in July, 1929, when he executed the renewal here sued upon. With this knowledge in hand he elected to remain with the corporation.

The judgment should bear interest from December 12, 1928, and not from April 7th. Thus modified it is affirmed, for we find no error in the record.

*Affirmed.*